Richard Lee DAVIS, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. No. L–2315.

United States District Court,
D. Kansas.

March 25, 1976.

Richard C. Wallace, Gen. Counsel, Wyandotte County Legal Aid Society, Kansas City, Kan., for plaintiff.

Monti L. Belot, Asst. U. S. Atty., Kansas City, Kan., for defendant.

DECISION AND ORDER OF
THE COURT

THEIS, District Judge.

Richard Lee Davis, the plaintiff herein, and formerly an inmate of the United States Penitentiary at Leavenworth, Kansas, has filed this action seeking compensatory relief under 18 U.S.C. § 4126 for injuries allegedly suffered as a consequence of his employment within the federal prison hospital. In previous opinions in this litiga-

tion this Court determined that the decision in *United States v. Demko*, 385 U.S. 149, 87 S.Ct. 382, 17 L.Ed.2d 258 (1966), precluded it from awarding damages as requested in the complaint, but that jurisdiction existed under § 10 of the Administrative Procedure Act (APA), 5 U.S.C. § 701, et seq., to subject the administrative decision of the Bureau of Prisons to a narrow review to ascertain its compliance with procedural due process requirements.[1] The Court also recognized that judicial review of the merits of the administrative decision itself should be restricted to the "arbitrary and capricious" standard prescribed by the APA.[2]

■ Notwithstanding the existence of jurisdiction to review the merits of the claim, the Court believes such action should be deferred until after a constitutional review of the challenged procedures has been completed. This result follows since the existence of constitutional deficiencies in the fact finding process would fatally infect the integrity of the administrative findings below and would preclude the Court from

considering the claim on the basis of the present record. Therefore, as an initial matter, the Court must undertake a constitutional scrutiny of the administrative procedures attending 18 U.S.C. § 4126, delineated in 28 C.F.R. §§ 301.1–301.18 (1975 Rev.).

In 18 U.S.C. § 4126, Congress authorized the Federal Prison Industries, Inc., a federal corporation, to award compensation to inmates "for injuries suffered in any industry or in any work activity in connection with the maintenance or operation of the institution where confined" under regulations to be promulgated by the Attorney General. The claim procedure as outlined in 28 C.F.R. § 301.2 requires the inmate to immediately report a work-related injury to his superior.[3] After appropriate medical treatment has been administered (if required), the work detail supervisor must secure a record of the cause, nature and extent of the injury by obtaining the names and testimony of all witnesses[4] and must submit to the inmate a form for his completion detailing the particulars of the incident and injury.[5] After a review of this form by

1. The Tenth Circuit's recent decision in *Bard v. Seamans*, 507 F.2d 765 (1974), wherein the Court held the Administrative Procedure Act to be jurisdictional, indicates the validity of this preliminary jurisdictional finding. See also *Ryan v. Shea*, 525 F.2d 268 (10th Cir. 1975).

2. See *Durham v. Federal Prison Industries*, 464 F.2d 1026 (5th Cir. 1972); *Thompson v. United States, Federal Prison Industries*, 492 F.2d 1082 (5th Cir. 1974).

3. 28 C.F.R. § 301.2 provides: Medical attention. Whenever an inmate worker is injured while in the performance of assigned duty, regardless of how trivial the hurt may appear, he shall immediately report the injury to his official superior. The employee will take whatever action is necessary to secure for the injured such first aid, medical, or hospital treatment as may be necessary for the proper treatment of the injury. Medical, surgical and hospital service will be furnished by the medical officers of the institution. Refusal by an inmate worker to accept such medical, surgical, hospital, or first aid treatment may cause forfeiture of any claim for accident compensation for disability resulting therefrom.

4. 28 C.F.R. § 301.3 provides: Record of injury and initial claim. After initiating necessary action for medical attention the work detail supervisor shall immediately secure a record of

the cause, nature and exact extent of the injury, and shall see that the injured inmate submits within 48 hours Administrative Form 19, Report of Injury (Inmate). The names and testimony of all witnesses shall be secured. If the injury resulted from the operation of mechanical equipment, an identifying description of the machine or instrument causing the injury shall be given.

5. 28 C.F.R. § 301.4 provides: Report of injury. (a) All injuries resulting in disability of the injured shall be reported by the inmate's work detail supervisor on Administrative Form 19, Report of Injury (Inmate). After review by the institution safety officer, or his appointed representative, for completeness, the report shall be delivered to the warden or superintendent of the institution; and then forwarded promptly to the Safety Administrator in the Washington office. All questions on Form 19 shall be answered in complete detail. The physician's statement must be secured on Administrative Form 19 whenever the injury is such as to require the attention of a physician.

(b) In the case of injury to an inmate sustained while employed in any work activity in connection with the maintenance or operation of the institution where confined, the reports and treatment of such injured inmate shall be made under the regulations in effect at the time of such injury. The reports as to treatment and

prison officials for completeness, the form must then be forwarded to the Safety Administrator in Washington, accompanied by a physician's statement if the injury necessitated a doctor's attention.[6]

Although these procedures occur proximately to the time of injury, the actual claim for compensation may not be filed by the inmate earlier than thirty days prior to release date,[7] the purpose of the compensatory scheme being to award benefits in proportion to the degree of employment disability suffered by the prisoner at the time of his reentry into the economic community. Within his compensation claim, the inmate must specify the nature of the disability and its effect upon his work capacity after release. After completion of the form by the inmate, the physician conducting the final examination contributes his conclusions concerning the existence, nature, and extent of any disability. Finally, the claim is forwarded to the Office of General Counsel and Review of the Federal Bureau of Prisons in Washington, D. C., accompanied by the original report tran-

scribed at the date of the injury, for determination of whether a just claim has been stated and, if so, in what amount compensation should be awarded. Should the claim be denied, the applicant may perfect an appeal to the Director of the Bureau of Prisons, who also decides on the basis of the record submitted.[8]

This procedure was essentially followed in this case. On August 30, 1971, the plaintiff, with the assistance of a prison official, prepared his written application for submission to the Bureau of Prisons, alleging that he suffered from a condition known as Meniere's disease.[9] On August 31, 1971, in accordance with the regulatory provisions, plaintiff was examined by the prison physician at the United States Penitentiary at Leavenworth, Kansas, who concluded that the plaintiff did suffer from Meniere's disease, but that no causal connection existed between the condition and the prison-related origins listed on his application.[10] Davis' subsequent request for a copy of the completed claim form and all supporting documents was denied, and he was provided no

the cause, nature, and extent of the injury shall be made to comply as nearly as possible with the requirements of §§ 301.2, 301.3, and this § 301.4.

6. Id.

7. 28 C.F.R. § 301.5 provides: Prerelease claim for compensation. (a) As soon as release date is determined, but not in advance of 30 days prior to release date, each inmate injured in Industries or on an institutional work assignment during his confinement, who has a residual impairment from a work-related accident, shall be given FPI Form 43 Revised, and advised of his rights to make out his claim for compensation. Every assistance shall be given him to properly prepare the claim if he wishes to file. Claims must be made within 60 days following release from the institution when circumstances preclude submission prior to release. However, a claim for disability may be allowed within 1 year after release from Federal custody, for reasonable cause shown. In each case a physical examination shall be given and a definite statement made as to the effect of the alleged injury on the inmate's work capacity after release. Failure to submit to a final physical examination before release shall result in the forfeiture of all rights to compensation and future medical treatment. In each case of visible impairment, disfigurement, or loss of member, photographs shall be taken to

show actual condition and shall be transmitted with FPI Form 43.

(b) The claim, after preparation and execution by the inmate, shall be completed by the physician making the final examination. It shall be forwarded promptly to the office of General Counsel and Review, Federal Bureau of Prisons, in Washington, D. C., accompanied by, or with reference made to, Form 19, Report of Institutional Injury (Inmate).

8. The Bureau of Prisons has, as a matter of policy, provided an aggrieved applicant the right of appeal to the Director of the Bureau of Prisons although no such procedure appears anywhere in the promulgated regulations.

9. Webster's Third New International Dictionary (1968) defines "Meniere's disease" as "a disorder of the membranous labyrinth of the ear that is marked by recurrent attacks of dizziness, tinnitus, and deafness, is often accompanied by nausea and vomiting, and is commonly attributed to increased pressures of the endolymphatic fluid, though it is possibly of obscure allergic origin."

10. Davis primarily contends that his condition is a consequence of repeated exposure to infectious diseases during the course of his assigned duties in the prison hospital.

**1090**

opportunity to respond to the doctor's findings. Plaintiff ultimately gained his release from the penitentiary on September 13, 1971, and two days thereafter his claim file was forwarded to the legal section of the Bureau of Prisons in Washington, D. C. for review on the merits by the Accident Compensation Committee.

Subsequently, on February 11, 1972, the Bureau denied plaintiff's claim with a brief written statement of reasons for the denial, concluding that his condition had developed prior to his incarceration in the penitentiary. After receiving the notice of denial, Davis initiated a series of inquiries seeking additional information for the denial of his claim and requesting an opportunity to personally appear before the Accident Compensation Committee. The Bureau denied his request to appear personally but did further explain the basis for the denial and notified him of his right to appeal to the Director of the Bureau of Prisons in a letter of April 12, 1972. Rather than pursue this course, plaintiff sent a missive to his congressman in which he expressed considerable dissatisfaction with the Bureau's treatment of his claim, prompting a further exchange of correspondence between the congressman and the Bureau to no substantive effect.[11] On September 21, 1972, Davis filed a damage claim in this court predicated upon the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq., which was ultimately dismissed for jurisdictional reasons under the Supreme Court's *Demko* decision, wherein the Court held 18 U.S.C. § 4126 to be the exclusive remedy for prisoners seeking relief for work-related injuries. Having related the pertinent facts which underlie the controversy, the Court will now address the merits of the due process challenge to the administrative procedures.

## I. WHAT IS THE NATURE OF PLAINTIFF'S INTEREST

Davis contends that the described procedures of the Bureau of Prisons deprive him of due process of law by not affording him the opportunity for an evidentiary hearing to challenge the accuracy of the prison physician's diagnosis and conclusions. He contends that he contracted Meniere's disease while employed as a medical assistant in the prison hospital and contends that such fact could be demonstrated should a hearing be provided. In commencing its assessment of whether and to what extent due process applies in this situation, the Court is mindful of the Supreme Court's explication in *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972), wherein it observed:

"Whether any procedural protections are due depends on the extent to which an individual will be 'condemned to suffer grievous loss.' *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 168, 71 S.Ct. 624, 646, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), quoted in *Goldberg v. Kelly*, 397 U.S. 254, 263, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970). The question is not merely the 'weight' of the individual's interest, but whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment. *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Once it is determined that due process applies, the question remains what process is due."

Necessarily then, the Court must initially consider the nature of the plaintiff's interest and determine whether it is of sufficient fiber to invoke the protections of the Fifth Amendment's due process clause. Succinctly stated, the applicant's interest consists of

**11.** This Court initially queried whether the issue of proper exhaustion of administrative remedies might be present where an intra-agency appeal had not been taken. However, upon consideration of the analysis in *United States v. Consolidated Mines & Smelting Co., Ltd.*, 455 F.2d 432 (9th Cir. 1971), the Court has concluded that § 10(c) of the Administrative Procedure Act, 5 U.S.C. § 704, renders it unnec-

essary for a litigant to exhaust the intra-agency appellate process unless an applicable statute or agency rule governing agency action so requires. Since no such statutory or regulatory requirement appears here, an appeal to the Director is not necessary to complete exhaustion of remedies. Discussion of this issue by the Ninth Circuit appears at 455 F.2d at 451.

a claim authorized by statute and regulations to secure compensation for alleged employment disabilities of prison origin that may severely restrict, and sometimes eradicate, his earning potential upon release into society. Although at the application stage of the proceedings neither plaintiff nor a claimant in his position has yet been administratively adjudged entitled to receive benefits under the regulatory scheme, an applicant nonetheless possesses a property interest of sufficient magnitude to invoke the protection of the Fifth Amendment's due process clause. Like the welfare plaintiffs in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), inmates have been granted an entitlement to compensation benefits under 18 U.S.C. § 4126 and its attendant regulations if they factually satisfy the criteria set forth by the regulations. By their establishment of an objective medical standard for qualification, the regulations create a legitimate expectancy that an individual application will not be denied unless the Bureau factually determines either that the claimant does not suffer from a disability originating from his prison employment, or from one that would affect his work capacity after release. Thus, a "cause" standard for denial of benefits is as fully established herein as it is in the termination of welfare benefits, *Goldberg v. Kelly*, supra, or in instances where a public job is held absent cause for termination. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 578, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 561 (1972); *Arnett v. Kennedy*, 416 U.S. 134, 164, 94 S.Ct. 1633, 1650, 40 L.Ed.2d 15, 39 (1974) (Powell, J. concurring). This property interest is one of substantial importance to the plaintiff, as its arbitrary denial could leave him with an uncompensated disability of lifelong duration and condemn him to "suffer grievous loss." *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 168, 71 S.Ct. 624, 646, 95 L.Ed. 817, 852 (1951) (Frankfurter, J., concurring).

Undoubtedly the landmark decision in the modern era explicating the nature of protected property interests is *Board of Regents v. Roth,* supra. Therein, the Supreme Court generally related the attributes of a property interest as follows:

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

"Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." (408 U.S. at 577, 92 S.Ct. at 2709).

The Court does not read the phrase "legitimate claim of entitlement" to mean that only one already receiving benefits merits due process protection. Indeed, other language in *Roth* itself expressly forecloses such a restrained interpretation of a legitimate property interest. After citing *Goldberg* as a decision exemplifying the type of interest deserving constitutional protection, the Court observed in a footnote:

"*Goldsmith v. United States Board of Tax Appeals*, 270 U.S. 117, 46 S.Ct. 215, 70 L.Ed. 494, is a related case. There, the petitioner was a lawyer who had been refused admission to practice before the Board of Tax Appeals. The Board had published rules for admission of persons entitled to practice before it, by which attorneys at law admitted to courts of the United States and the states, and the District of Columbia, as well as certified public accountants duly qualified under the law of any state or the District are made eligible. . . . The rules further provide that the Board may in its discretion deny admission to any appli-

cant, or suspend or disbar any person after admission.' Id., at 119, 46 S.Ct., at 216. The Board denied admission to the petitioner under its discretionary power, without a prior hearing and a statement of the reasons for the denial. Although this Court disposed of the case on other grounds, it stated, in an opinion by Mr. Chief Justice Taft, that the existence of the Board's eligibility rules gave the petitioner an interest and claim to practice before the Board to which procedural due process requirements applied. It said that the Board's discretionary power 'must be construed to mean the exercise of a discretion to be exercised after fair investigation, with such a notice, hearing and opportunity to answer for the applicant as would constitute due process.' Id., at 123, 46 S.Ct. at 217." (408 U.S. at 577–578 n. 15, 92 S.Ct. at 2708–2709.)

The preceding footnote clearly indicates the Court's recognition that an applicant may have a protected interest if his claim derives from established rules and procedures defining eligibility. Moreover, it demonstrates that the legitimacy of an alleged interest does not inherently depend upon whether the person has previously been receiving the desired benefit. Although the lawyer therein was initially seeking the right to practice before the Board, he nonetheless possessed a property right emanating from the Board's own rules. Similarly, in this case, Davis possesses a legitimate claim of entitlement deriving from the Bureau's eligibility regulations despite the fact that he has not heretofore been the recipient of benefits. See *Schatz v. Cutler*, 395 F.Supp. 271 (D. Vt. 1975).

Further support for this conclusion may also be gleaned from *Roth*. In analyzing the previous decision in *Goldberg*, the *Roth* Court commented:

"[T]he welfare recipients in *Goldberg v. Kelly*, supra, had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them. The recipients had not yet shown that they were, in fact, within the statutory terms of eligibility. But we held

that they had a right to a hearing at which they might attempt to do so." (408 U.S. at 577, 92 S.Ct. at 2709.)

This statement demonstrates that the focal point of *Goldberg* was not upon the fact that benefits had previously been received, but upon the existence of statutory provisions creating the right to welfare and defining the terms under which it could be obtained. Just as in the instant case, the *Goldberg* welfare plaintiffs may or may not have been deserving of benefits at the time the dispute arose. Nonetheless, their reasonable expectancy could not be arbitrarily abrogated. Thus, in view of the analysis of *Roth* and other cases previously cited herein, the Court believes that the plaintiff possesses a legitimate expectancy that merits the protective safeguards of Fifth Amendment due process.

## II. DOES DUE PROCESS REQUIRE A HEARING PROCEDURE?

■ Having determined that plaintiff's property interest is one deserving the salutary protections of the due process clause, it remains to be considered what particular procedures due process requires under these circumstances. In commencing this aspect of the analysis, the Court follows the familiar standard enunciated in *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 62 L.Ed.2d 1230 (1961), now virtual scripture in the law of due process:

"[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action."

In other words, a balancing process is mandated which requires the Court to first identify and isolate the competing interests and then weigh their relative importance before reaching its constitutional assessment of the particular procedure required. Having already identified the nature of the plaintiff's interest, the Court must now

identify and examine the interests advanced by the government for withholding the right to a hearing.

■ The Bureau asserts a trilogy of considerations which it believes outweigh, both individually and collectively, the need for an adversary hearing. The first two reasons proffered appear to be obverse sides of the same coin. The government initially argues that since the administrative offices of the Bureau of Prisons are located in Washington, D. C., the imposition of a hearing procedure to be held at strategic sites throughout the United States would unduly interfere with the centralized management and administrative efficiency of the Bureau's present structure and would accordingly cause a severe strain on the Bureau's available manpower and financial resources. Secondly, it is argued that if this Court defers to the expressed desire for administrative centralization by requiring that any hearings prescribed be held in Washington, D. C., the proper management of the nation's federal parole system would be significantly jeopardized since it could conceivably cause some inmates released on parole to violate travel restrictions occasionally imposed as a condition of release by requiring their travel to the hearings. Finally, the United states contends that the Court should judicially notice the alleged subjective nature of plaintiff's particular claim in adjudging the validity of the present framework and recognize that the existing methodology is adequate to resolve the great majority of objectively determinable claims that will be presented.

After analysis of the competing considerations, the Court is convinced that the plaintiff's need for a proper forum in which to present his claim and protect his property interest substantially outweighs the reasons advanced by the government for denying a hearing. In *Barnett v. Lindsay*, 319 F.Supp. 610, 612 (D. Utah 1970) (three-judge court), a case which involved the denial of a hearing by the state to a welfare *applicant*, Chief Judge Lewis of the Tenth Circuit clearly and concisely delineated the nature of the applicant's interest and the rights that should attend it, in declaring:

"The rule established by *Goldberg* was grounded on the constitutional hypothesis that welfare benefits 'are a matter of statutory entitlement.' 90 S.Ct. at 1017 n. 8. As such, summary denial of welfare assistance cannot be distinguished from summary termination. Just as the entitlement is created by statute for the benefit of needy persons meeting specified qualifications, so the rights surrounding that entitlement are created when the statutorily defined need arises and not after the benefits have been dispensed. Consequently, it is at this time that the constitutional protections surrounding those rights must be first applied. Accordingly, the procedural protections described in *Goldberg* must be applied at all stages of the welfare process whenever the proposed administrative action contemplates the denial or termination of statutorily created welfare benefits."

This reasoning applies with compelling force to the instant situation where the need for a hearing is paramount and where the interests urged by the government are of comparatively lesser significance. The claimant's interest here is too substantial to be relegated to a mere written application which does not afford him an opportunity to challenge the statements and conclusions of the prison physician. The Supreme Court has recognized the inherent frailties in a system of public benefits that depends upon written presentations for resolution of individual claims, observing in *Goldberg* with reference to welfare applications:

"Written submissions are an unrealistic option for most recipients, who lack the educational attainment necessary to write effectively and who cannot obtain professional assistance. Moreover, written submissions do not afford the flexibility of oral presentations; they do not permit the recipient to mold his argument to the issues the decision maker appears to regard as important. Particularly where credibility and veracity are at

issue, . . . written submissions are a wholly unsatisfactory basis for decision." [12] (397 U.S. at 269, 90 S.Ct. at 1021.)

Similarly crucial to a proper resolution of the issues is an opportunity for the claimant to challenge the evidence relied upon by the government. As the Court articulated in *Greene v. McElroy*, 360 U.S. 474, 496–497, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959):

"Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. . . . We have formalized these protections in the form of confrontation and cross-examination."

In view of the marked deficiencies existing in the present regulatory structure, the United States has failed to present any rational governmental consideration to justify the severity of the procedure. The government's initial argument for preservation of the centralized administration of the Bureau of Prisons can be basically reduced to a plea for administrative convenience and for restraint upon additional expenditures that might be necessitated by a nationwide hearing process. Although some additional expense, as well as new administrative tasks, may be necessitated by a hearing requirement, these considerations are not of sufficient substance to preclude the implementation of constitutional rights. The Court fails to comprehend how administrative efficiency and integrity would be compromised nor why the Bureau could not easily dispense hearing examiners to select-

ed sites throughout the nation to conduct the hearings.[13] The operation of such a system by the Bureau would have the ancillary benefit of reducing, if not entirely eliminating, any necessity for extended journeys by those former inmates under geographical parole restrictions to points beyond their limited perimeters. Any interference with the functions of the United States Board of Parole will be slight, and in any event, one-time journeys by parolees beyond these geographical enclosures for the beneficient purpose of a hearing could readily be verified and approved by the Board in advance with little difficulty.

The third contention of the government, i. e., that the Court should take cognizance of the specious and subjective nature of the plaintiff's claim and adjudge the present system adequate to resolve the great majority of objective claims, entirely misses the mark. The absence of a hearing in the current regulatory scheme is constitutionally significant because it so substantially impairs the integrity of the fact finding process. It is for the administrators to decide, and not the Court, the validity or invalidity of each individual claim after complete presentation of all the facts and arguments. A preview of the merits of the claim at this juncture without a hearing would involve the Court in the very vice sought to be eradicated. Regardless of the alleged subjective nature or the individual merits of plaintiff's claim, the present procedure is constitutionally inadequate to resolve this or any other claim because it arbitrarily permits the prison physician's contrary medical conclusion to stand totally unchallenged and provides no meaningful method to assert the statutory right.

Although the government concedes that a modicum of due process attends an applica-

---

**12.** In the system under examination, credibility in the sense of truth or falsity is not the essential consideration. Rather, credibility concerns the propensity of the procedure to breed erroneous factual determinations.

**13.** Indeed, the Court notes that the Bureau has but recently implemented a regionalization plan. Although its headquarters remains locat-

ed in Washington, D. C., the Bureau has now established regional administrative offices in Burlingame, California; Atlanta, Georgia; Philadelphia, Pennsylvania; Dallas, Texas; and Kansas City, Missouri. Thus, it appears that hearings could be conducted from these additional sites with little or no interference with the Bureau's present administrative makeup, perhaps at the federal prisons themselves.

tion for public benefits, it nevertheless contends that a distinction should be drawn between applications for, as opposed to termination of, benefits. According to the theory of the government, the full panoply of constitutional procedures which becomes necessary when the government authorizes or participates in a taking or termination of an individual's liberty or property already acquired does not apply with equal force to an application proceeding seeking the initial receipt of a public gratuity.

In support of its contention, the government cites the cases of *United States Board of Parole v. Merhige*, 487 F.2d 25 (4th Cir. 1973), and *Scarpa v. Board of Parole*, 477 F.2d 278 (5th Cir. 1973), vacated as moot, 414 U.S. 809, 94 S.Ct. 79, 38 L.Ed.2d 44 (1973). In both cases the Courts rejected arguments that prisoners who had applied for release on parole were entitled under the due process clause to hearings before the Board upon determinations of their eligibility for parole. The opinion in *Scarpa*, subsequently followed by the Fourth Circuit in *Merhige*, declared, at 282:

> "[O]nce a cognizable benefit is conferred or received, governmental action must not be employed to infringe upon that right without some form of prior hearing. We are unaware, however, of any authority for the proposition that the full panoply of due process protections attaches every time the government takes some action which confers a new status on the individual or denies a request for a different status."

The Court additionally noted several factors unique in the parole context which formed the basis for its holding: (1) the broad discretion of the Parole Board in considering parole applications is clearly distinguishable from revoking one's conditional freedom; (2) one already incarcerated suffers no deprivation of liberty by his continuation in confinement; and (3) the non-adversary and rehabilitative purpose of the parole system.

Whatever force these decisions have in the parole context [14] the Court believes that the historically discretionary nature of the parole process distinguishes them from the instant case where upon proof of a set of facts an applicant is *entitled* to receive the benefits provided by the regulatory scheme. As the Supreme Court noted in *Goldberg* in discussing the nature of welfare benefits, "such benefits are a matter of statutory entitlement for persons qualified to receive them." (397 U.S. at 262, 90 S.Ct. at 1017). The Court also expressed its concern that the termination proceedings might deprive an "eligible" recipient of the benefits due him. These considerations apply equally herein.

In the context of the regulatory scheme involved herein, the Court cannot concur in the government's contention that the ritualistic incantation of the word "application" suggests a different constitutional format from that required by an extended line of Supreme Court and lower court decisions. The Court's opinion in *Barnett v. Lindsay*, supra, directly negates the distinction urged here upon the Court. Likewise, several other decisions, either explicitly or implicitly, have rejected arguments similar to those proposed here. In the landmark decision of *Hornsby v. Allen*, 326 F.2d 605 (5th Cir. 1964), the Court held that the denial of an individual's application for a liquor license from the municipal licensing authority without a hearing violated the due process mandate of the Fourteenth Amendment. Deeming the licensing process an adjudicative act, the Court reasoned, at 608:

> "Since licensing consists in the determination of factual issues and the application of legal criteria to them—a judicial act—the fundamental requirements of due process are applicable to it. Due process in administrative proceedings of a judicial nature has been said generally to be conformity to fair practices of Anglo-Saxon jurisprudence, which is usually equated with adequate notice and a fair hearing. Although strict adherence to

---

**14.** It should be noted that the same court that decided *Scarpa* now characterizes that decision as possessing no "precedential value." See *Ridley v. McCall*, 496 F.2d 213 (5th Cir. 1974).

the common-law rules of evidence at the hearing is not required, the parties must generally be allowed an opportunity to know the claims of the opposing party, to present evidence to support their contentions, and to cross-examine witnesses for the other side. Thus, it is not proper to admit ex parte evidence, given by witnesses not under oath and not subject to cross-examination by the opposing party." (Citations omitted.)

Although the Court acknowledged the State's broad authority to regulate or entirely prohibit traffic in intoxicating liquor, it nevertheless observed that the mere fact that a liquor license might be deemed a privilege or that liquor might be a public menace did not relieve the municipal authorities of the strictures of the due process clause. Although the Court did not specifically identify the nature of the claimant's interest meriting constitutional protection, it was later characterized by the Fifth Circuit as a property interest. See *Bussie v. Long*, 383 F.2d 766 (5th Cir. 1967). See also *Greene v. McElroy*, supra, 360 U.S. at 492, 79 S.Ct. at 1411, 3 L.Ed.2d at 1388; *United States v. Briggs*, 514 F.2d 794, 798 (5 Cir. 1975).

In *Davis v. Toledo Metropolitan Housing Authority*, 311 F.Supp. 795 (N.D.Ohio 1970), an applicant for public housing was summarily rebuffed by the Authority without an opportunity for a hearing. Although not defining with precision the character of the applicant's right, the Court, relying primarily upon the *Goldberg* decision, invalidated the application procedure as a contravention of the due process clause, observing at 797:

".  .  . there can be little doubt that recipients of public benefits are entitled to an evidentiary hearing before their benefits may be terminated. It seems clear, therefore, that those seeking to be declared eligible for public benefits may not be declared ineligible without the opportunity to have an evidentiary hearing."

In the same vein, in *Alexander v. Silverman*, 356 F.Supp. 1179, 1180 (E.D.Wis.1973),

the Court applied the rationale in *Goldberg* to an application for welfare benefits, which it categorized as within a broad concept of "property," observing that "[i]t would be irrational to hold that an individual's entitlement to welfare is affected by whether he has been receiving welfare in the past." Cases of a similar thrust are *Freitag v. Carter*, 489 F.2d 1377 (7th Cir. 1973); *Raper v. Lucey*, 488 F.2d 748 (1st Cir. 1973); *Neddo v. Housing Authority of City of Milwaukee*, 335 F.Supp. 1397 (E.D. Wis.1971); *Rios v. Hackney*, 294 F.Supp. 885 (N.D.Tex.1967); *Smith v. Ladner*, 288 F.Supp. 66 (D.Miss.1968); *Homer v. Richmond*, 110 U.S.App.D.C. 226, 292 F.2d 719, 722 (1961); Cf. *Shaw v. Hospital Authority of Cobb County*, 507 F.2d 625 (5th Cir. 1975).

In addition to *Roth*, supra, the reasoning of the Supreme Court in *Willner v. Committee on Character and Fitness*, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963), also suggests the Court's rejection in that case of the distinction here urged by the Bureau. Therein, the New York courts denied the petition of an applicant for admission to the bar upon the grounds of moral unfitness without affording him an opportunity for a hearing. Observing that the denial of the petition substantially hindered the individual's pursuit of a likelihood, the Court held that fundamental considerations of due process required that a hearing be held so that the applicant might confront the evidence against him.

■ Collectively, these decisions indicate that the applicability of due process safeguards depends not upon the mechanistic invocation of words such as "termination" or "application," but rather upon a studied comparison of the nature of the individual's interest and the consequences of its denial with the public considerations proffered as justification for withholding the right to a hearing. Of course, to determine that due process applies in a given instance is not to inevitably mandate a hearing procedure in all cases. "Once it is determined that due process applies, the question remains what

process is due." *Morrissey v. Brewer,* supra. However, after weighing the competing considerations herein, the overriding constitutional necessity for a hearing procedure is evident.[15] In these circumstances, the principle that "the fundamental requisite of due process of law is the opportunity to be heard," has compelling applicability. *Grannis v. Ordean,* 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914).

**15.** The Court does not believe that the Supreme Court's decision in *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), suggests a contrary result. Therein, a claimant seeking social security disability benefits challenged the administrative hearing procedures contending that the admission in evidence of medical reports of physicians who had examined him constituted hearsay and deprived him of his constitutional right to confront and cross-examine adverse witnesses. In rejecting the plaintiff's constitutional challenge, the Court noted the general reliability of such reports, that conflicting medical opinions do not present "the specter of questionable credibility and veracity," and that no attack on the physicians' credibility had been made therein. However, the Court additionally noted the existence of other crucial factors which clearly distinguish the procedures upheld therein from those in this case and which completely dispel any notion that the Court authorized the constitutional immunization of physicians' statements from cross-examination. The Court observed that the physicians' reports were available for inspection by the claimant prior to the evidentiary hearing and more significantly stated that existing procedures allowed the claimant to compel the doctors' presence by subpoena and subject them to cross-examination. In distinct contrast to those procedures, the claimant herein has been provided no opportunity to examine the doctors' statements nor the privilege of testing their accuracy by cross-examination, and challenges the doctors' examinations as perfunctory.

Another important element distinguishing the two systems consists of the fact that the social security disability procedures recognize the significance of and authorize the introduction of subjective evidence of disability through the claimant's own testimony, while the Bureau's procedures do not. In this respect, the credibility and veracity of the claimant can be of substantial significance in demonstrating qualification for benefits and the claimant should be provided the opportunity to persuade the factfinder by his own testimony. *Page v. Celebrezze,* 311 F.2d 757 (5th Cir. 1963). That *Perales* did not enshrine medical testimony in a unique position and thus did not exempt it from traditional due process precepts has been

## III. WHAT PROCEDURES SHOULD BE INCLUDED IN THE HEARING PROCESS?

Since the Court has determined that the interest asserted by plaintiff is encompassed within the concept of property under the Fifth Amendment and that its protection outweighs the public considerations articulated for denying a hearing, consideration should now focus on the type of proce-

the conclusion of recent decisions. See *Eldridge v. Weinberger,* 361 F.Supp. 520, 524 (W.D.Va.1973), aff'd 493 F.2d 1230 (4th Cir. 1974), rev'd, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18, 44 U.S.L.W. 4224 (1976); *Williams v. Weinberger,* 360 F.Supp. 1349 (N.D.Ga. 1973), aff'd. 494 F.2d 1191 (5th Cir. 1974). See also *Snead v. Dept. of Social Services of City of New York,* 355 F.Supp. 764, 772 (S.D.N.Y.1973) (3-judge court), vacated 416 U.S. 977, 94 S.Ct. 2376, 40 L.Ed.2d 755 (1974), reaff'd 389 F.Supp. 935 (1974), vacated for consideration of mootness, 421 U.S. 982, 95 S.Ct. 1985, 44 L.Ed.2d 474 (1975). Contra, *Siletti v. New York City Employees' Retirement System,* 401 F.Supp. 162 (S.D.N.Y.1975).

The Court does not view the Supreme Court's recent reversal of *Eldridge,* supra, as a statement of disapproval of the district court's reasoning on the narrow question discussed in this note. As articulated by Mr. Justice Powell, the issue in *Eldridge* was "whether the Due Process Clause of the Fifth Amendment requires that prior to the termination of Social Security disability benefit payments the recipient be afforded an opportunity for an evidentiary hearing." (424 U.S. at 323, 96 S.Ct. at 897.) In reversing the judgments of the lower courts, the Court merely held that the rather extensive procedures preceding the initial administrative termination decision coupled with the right to a plenary evidentiary hearing prior to the final decision to terminate benefits satisfied the demands of due process. The elaborate regulatory system sanctioned by the Court's opinion stands in marked contrast to the Bureau's procedures which afford absolutely no right to an evidentiary hearing nor even the most minimal opportunity to respond to the physician's findings prior to denial of the application. If anything, the Court's opinion emphasizes the glaring constitutional infirmity of the procedures challenged herein. This latest decision is consistent with the reasoning of prior Supreme Court cases "that some form of hearing is required before an individual is finally deprived of a property interest." (424 U.S. at 333, 96 S.Ct. at 902.) Today's opinion requires no more.

dures constitutionally required within the disability compensation framework. In performing this task, the Court is cognizant of the fact that it may not undertake legislative or administrative functions and seeks only to elucidate the minimum procedural requirements of due process.

The Bureau itself has already authorized a fact-finding procedure within the prison walls at the initial stage of the claim process, i. e., at the date of injury (28 C.F.R. § 301.3). However, since this preliminary stage of the proceedings has long since passed in plaintiff's case and is incapable of reconstruction at this juncture, the Court need not resolve the question of the constitutional sufficiency of these initial procedures but must concentrate on the requirements of due process in light of existing factual circumstances. In this respect, it is significant that Davis has exhausted the available administrative procedures provided by the Bureau's regulations.

Suffice it to say for present purposes that due process requires that a plenary hearing now be conducted by the Bureau to determine the validity of plaintiff's claim. At the hearing it will be necessary to decide the ultimate issues of (1) the existence or non-existence of a disability of prison origin; (2) whether a disability, if discovered, will affect the inmate's post-release employment capacity; and (3) if so, the amount of compensation to be awarded.

■ Since an inmate in this position will undoubtedly have been released prior to the scheduling of a final hearing, the hearing procedure will transpire in an atmosphere dramatically different from the restrictive confines of the prison environment. Since none of the limitations upon the hearing process present in the prison context will apply to this proceeding,[16] the hearing should possess those guaranties normally identified as necessary to insure a full and fair consideration of an individual claim. These due process minima should include: (1) written notice of the time and place of the hearing and the issues to be considered; (2) the opportunity to be heard in person and to present witnesses and documentary evidence; (3) the ability to cross-examine adverse witnesses; (4) a neutral hearing officer (who may, of course, be an employee of the Bureau); and (5) a brief written statement of the reasons for denial of the claim. See *Morrissey v. Brewer,* supra, 408 U.S. at 489, 92 S.Ct. at 2604, 33 L.Ed.2d at 499; *Goldberg v. Kelly,* supra, 397 U.S. at 269–271, 90 S.Ct. at 1021–1022, 25 L.Ed.2d at 299–301.

■ The unrestricted setting of the hearing also mandates the availability of other liberties depending upon the claimant's financial capability to obtain them. Like the disability hearings provided under the Social Security Act (42 U.S.C. § 405), and the Federal Employees' Compensation Act (5 U.S.C. § 8101 et seq., § 8127), the former inmate should possess the opportunity to retain counsel to assist him in the proceeding should he desire to do so. Since a decision by the fact-finder will largely depend upon expert medical testimony, a lawyer's participation in eliciting testimony and in cross-examination of the prison physician who examined the claimant immediately prior to release would appear to be beneficial. Similarly, the claimant should have the privilege to obtain a medical examination by a physician of his own choosing and to present his testimony at the hearing if he so desires. However, it must be emphasized that the availability of these privileges will depend upon the viability of the claimant's own financial capabilities, as they do in other civil proceedings of this nature. Although many former inmates may indeed be hard-pressed to afford these privileges, their inclusion at government expense as a matter of right has not been adjudged a constitutional necessity by any Supreme Court decision in comparable circumstances. Cf. *Morrissey v. Brewer,* supra; *Goldberg v. Kelly,* supra. Moreover, the practice of law as it now exists contemplates that attorneys may be employed upon a contingent fee basis if the claim has any semblance of merit.

16. Cf. *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

■ One final matter requires comment. Despite the Bureau's contention that existing regulations and the need for confidentiality mandate that a prisoner not be permitted access to his inmate file prior to filing his claim, the Court believes that the harsh consequences of non-disclosure outweigh any desire for secrecy. Whatever the need for confidentiality of an inmate's records throughout the duration of his incarceration, no substantial need exists when the prisoner is certain to obtain his immediate release. Only disclosure of those portions of the inmate's files pertaining to his medical history need be made, including of course, the final examinations by the prison physician. The immediate interest in analyzing and responding to this information is paramount in effecting a just resolution of the applicant's claim and any institutional interests in rehabilitation or security would not seem to be furthered by blanket non-disclosure at this stage. Especially in view of the absence of any cognizable policy interests in non-disclosure in this case, the most basic notions of fairness dictate that the plaintiff be permitted to examine and analyze the physician's findings reasonably in advance of the hearing so that he may be apprised of their nature and be able to prepare a sufficient response thereto. The inclusion of these procedures, as well as those previously enunciated herein, should considerably enhance the fairness and factual reliability of the claims procedure under 18 U.S.C. § 4126, and fully implement the constitutional due process mandate. "The object is to insure the agency will acquire the information it should have in a manner fairly calculated to illuminate the issues for reasoned decision-making." *Northern California Power Agency v. Morton,* 396 F.Supp. 1187, 1192–1193 (D.D.C. 1975).

In sum, the present procedure operates arbitrarily by entrusting a critical factual determination to a mere written form which provides the claimant no meaningful opportunity to combat the superior resources of the government in presenting evidence opposing his claim, and which even denies him the elemental fairness of viewing the government's response to his application. So constituted, the procedure is woefully inadequate in properly developing the facts upon which the decision must rest. Since 18 U.S.C. § 4126 provides the exclusive remedy for collection of benefits by an inmate, a claimant has no other means of redress should he be the victim of an arbitrary denial and thus may be condemned to endure the draconian effects of an uncompensated disability. The Bureau has failed to present any rational justification for such a drastic curtailment of the rights of a disability claimant. Although the government undoubtedly has the power to preclude access to benefits of this nature by not affording the right in the first instance, once established it may not arbitrarily deny the means to effectively implement the statutory right.[17] See *Crawford v. Short,*

---

17. If it be contended that the requirements of due process of law are measured by the breadth of the rights conferred by the regulatory procedure rather than by the terms of the Constitution, note should be taken of the analyses of the Supreme Court in two recent opinions. In *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), the Court upheld the constitutionality of the Lloyd-LaFollette Act, 5 U.S.C. § 7501, and its attendant regulations authorizing a federal agency to terminate a nonprobationary employee for "cause" without providing a prior hearing, although a majority opinion did not emerge from the case. The government conceded that the "cause" standard conferred a property right upon the employee but argued that the extent of the right was that delineated by statute, which provided that "cause" should be initially determined by the nonhearing procedures specified therein. A three-judge plurality, per Mr. Justice Rehnquist, agreed with this rationale and opined that the degree of process due the employee to contest his dismissal was defined by the statute which conferred the substantive right and not by the contours of Fifth Amendment due process. The plurality stated its holding as follows:

"The District Court, in its ruling on appellee's procedural contentions, in effect held that the Fifth Amendment in the United States Constitution prohibited Congress, in the Lloyd-LaFollette Act, from granting protection against removal without cause and at the same time—indeed, in the same sentence—specifying that the determination of cause should be without the full panoply of rights which attend a trial-type adversary hearing. We do not believe that the Constitution so limits Congress in the manner in which bene-

**1100**

387 F.Supp. 282, 286 (S.D.Tex.1975). As the "touchstone of due process is protection of the individual against arbitrary action of government," *Dent v. West Virginia,* 129 U.S. 114, 123, 9 S.Ct. 231, 233, 32 L.Ed. 623 (1889), the present regulatory procedures established by 28 C.F.R. § 301 must be deemed constitutionally defective under the clear mandate of prior cases and therefore in disaccord with congressional intent and the delegation of power conferred by 18 U.S.C. § 4126.

In closing, the Court wishes to emphasize that its opinion today in nowise questions the good faith of the Bureau of Prisons in its administration and management of the present regulatory system. To the contrary, the Court is convinced that the personnel of the Bureau have dutifully and commendably performed their respective

tasks as required by the regulations. The Court merely holds today that these regulations do not comport with Fifth Amendment due process insofar as they fail to provide an opportunity for a hearing to an applicant who continues to have a good faith factual dispute with the Bureau after exhaustion of the existing administrative process.

Relative to this plaintiff, the Court directs the Bureau of Prisons to provide him with a meaningful due process hearing comporting with the principles enunciated in this opinion within ninety days of this order. Further, the Court strongly suggests revision and reevaluation of the current regulations relative to administration of the provisions of 18 U.S.C. § 4126 to implement the suggested procedures herein set forth. The Court directs that all filings and no-

fits may be extended to federal employees." (416 U.S. at 151, 94 S.Ct. at 1643).
Concurring in the result, Justices Powell and Blackmun upheld the constitutionality of the procedural system upon the divergent rationale that the regulatory provisions providing a plenary hearing to the discharged employee upon appeal to the Civil Service Commission, when coupled with the protections afforded by statute, satisfied the demands of constitutional due process. In so holding, these members of the court expressly rejected the reasoning of the plurality, observing:
"The plurality would thus conclude that the statute governing federal employment determines not only the nature of appellee's property interest, but also the extent of the procedural protections to which he may lay claim. . . . This view misconceives the origin of the right to procedural due process. That right is conferred not by legislative grace but by constitutional guarantee. While the legislature may elect not to confer a property interest in federal employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards. As our cases have consistently recognized, the adequacy of statutory procedures for deprivation of a statutorily created property interest must be analyzed in constitutional terms." (Citations and footnote omitted.) (416 U.S. at 166–167, 94 S.Ct. at 1650–1651.)
The remaining members of the Court agreed with the Powell-Blackmun analysis on the due process issue. See 416 U.S. at 177–178, 94 S.Ct. at 1660, 40 L.Ed.2d at 46 (Mr. Justice White concurring in part and dissenting in part); 416 U.S. at 203, 94 S.Ct. at 1668, 40 L.Ed.2d at 61 (Mr. Justice Douglas dissenting);

416 U.S. at 210–211, 94 S.Ct. at 1671–1672, 40 L.Ed.2d at 65–66 (Mr. Justice Marshall dissenting). Thus, a clear majority of the Court adheres to the view that the Constitution defines due process once a protected interest is conferred.
This position was reaffirmed in *Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974), wherein the Court observed in assessing the constitutional validity of prison disciplinary procedures governing good-time forfeitures:
"Nebraska may have the authority to create, or not, a right to a shortened prison sentence through the accumulation of credits for good behavior, and it is true that the Due Process Clause does not require a hearing 'in every conceivable case of government impairment of private interest.' *Cafeteria Restaurant Workers v. McElroy,* 367 U.S. 886, 894 [81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230] (1961). But the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within the Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state created right is not arbitrarily abrogated. This analysis as to liberty parallels the accepted due process analysis as to property."
In view of these recent pronouncements from the Supreme Court, the Bureau of Prison's procedures must be assessed in light of traditional due process concepts.

tices in connection with the processing of plaintiff's claim be supplied to the Clerk of this Court for filing herein. The Court will retain jurisdiction of this cause pending compliance with the Court's order and the views expressed in the accompanying opinion.