NATIONAL ASSOCIATION OF RADIATION SURVIVORS, a California non-profit corporation; Swords to Plowshares Veterans Rights Organization, a California non-profit corporation; Don E. Cordray, an individual; Albert R. Maxwell, an individual; Reason F. Warehime, an individual; Doris J. Wilson, an individual, Plaintiffs,

v.

Harry N. WALTERS, Administrator of The Veterans Administration; the United States of America; the Veterans Administration; Paul D. Ising, Director, San Francisco Regional Office, The Veterans Administration, Defendants.

No. C–83–1861–MHP.

United States District Court, N.D. California.

June 12, 1984.

---

Kathleen V. Fisher, Gordon P. Erspamer, Michael F. Ram, Morrison & Foerster, San Francisco, Cal., for plaintiffs.

George Christopher Stoll, Asst. U.S. Atty., San Francisco, Cal., Edward J. Lukey, Deputy Asst. Gen. Counsel, Veterans Dept., Washington, D.C., Jack Nagan, San Francisco, Cal., for defendants.

## OPINION

PATEL, District Judge.

### I. *Introduction*

■ Plaintiffs, who were veterans organizations, veterans, and a veteran's widow, seek a preliminary injunction enjoining the enforcement of 38 U.S.C. §§ 3404–3405.[1] These sections impose a flat $10.00 fee limit for all work performed by an attorney in representing a veteran pursuing Service-Connected Death and Disability ("SCDD") claims, 38 U.S.C. § 301 *et seq.*, before the Veterans Administration ("VA").[2] Section 3404 limits fees for attorneys and claims agents to $10.00 per successful claim:

> (c) The administrator shall determine and pay fees to agents or attorneys recognized under this section in allowed claims for monetary benefits under laws administered by the Veterans' Administration. Such fees—
>
> (1) shall be determined and paid as prescribed by the Administrator;
>
> (2) shall not exceed $10 with respect to any one claim; and
>
> (3) shall be deducted from monetary benefits claimed and allowed.

Section 3405 subjects an attorney to possible imprisonment at hard labor or a fine if she independently seeks to charge a fee in excess of the $10.00 provided by the VA for successful claims:

> Whoever (1) directly or indirectly solicits, contracts for, charges, or receives, or

---

1. Plaintiffs have also asked the court to enjoin the VA from violating its own regulations. (Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction at 23). However, as this claim is not contained in plaintiff's complaint it is not properly before the court and is not considered.

2. *See also* 38 C.F.R. § 14.634(a) (regulations implementing fee limitation).

attempts to solicit, contract for, charge or receive, any fee or compensation except as provided in sections 3404 or 784 of this title, ... shall be fined not more than $500 or imprisoned at hard labor for not more than two years, or both.

Plaintiffs argue that the application of the $10.00 fee limit imposed by 38 U.S.C. §§ 3404–3405 is unconstitutional because it deprives them of their right to procedural due process under the Fifth Amendment of the United States Constitution and their First Amendment rights to petition for redress of grievances and to associate freely. They do not suggest that the government is obliged to appoint an attorney to act on their behalf, but argue that the due process clause and First Amendment of the Constitution proscribe the government from preventing veterans from hiring their own qualified attorneys to represent them in pursuing SCDD benefits.

■ Plaintiffs are all either veterans' organizations, members of which have pending SCDD claims before the VA, or individuals who were prevented from obtaining an attorney to represent them in their claims before the VA because of the $10.00 limit. The plaintiff class includes both recipients of benefits who have been threatened with termination and applicants for benefits. Plaintiff National Association of Radiation Survivors ("NARS") is an organization of veterans whose purpose is to obtain health care, compensation, and other benefits for its members and their families. Its members are veterans who participated in atomic bomb tests, and many have pending SCDD claims. Plaintiff Swords to Plowshares Veterans Rights Organization ("Swords to Plowshares") is a veterans organization which focuses its efforts on Vietnam veterans. Some of its staff and many of its clients are recipients or appli-

cants for SCDD benefits. Plaintiff Albert R. Maxwell alleges that as a prisoner of war during World War II he was exposed to radiation from the Hiroshima and Nagasaki bombs, causing him to contract cancer and other disorders and causing four of his five children to die of rare congenital abnormalities in early childhood. His claims for radiation-related ailments were denied. Although he contacted an attorney to represent him the attorney declined because of the $10.00 fee limitation. Plaintiff Reason F. Warehime was part of a clean-up detail to Nagasaki and present at an atomic test which he alleges caused a variety of ailments. When his disability rating was lowered from 100% to 60% by the VA he contacted several attorneys to challenge this change, but was unable to obtain representation because of the $10.00 limit. Plaintiff Doris Wilson, finally, is the widow of a veteran whose ship was allegedly contaminated by radiation and who subsequently died of cancer. Ms. Wilson attempted to hire an attorney to represent her in her husband's claim for SCDD but failed due to the $10.00 limit. The claim was denied.[3]

Defendants are the VA, its Administrator, Walters, and its San Francisco Regional Director, Ising.

■ While 38 U.S.C. § 211(a) provides that VA decisions concerning veterans' benefits are final, and while this provision has been construed to prohibit judicial review of the VA's handling of benefit claims, the section does not bar constitutional challenges to the veterans' benefits laws. *Demarest v. United States,* 718 F.2d 964, 965–66 (9th Cir.1983). Accordingly, § 211(a) does not deny this court jurisdiction over plaintiffs' case. Nor did this court find it appropriate to dismiss plaintiffs' case for failing to state a claim upon

**3.** Don Cordray, one of the original plaintiffs, is now deceased. Cordray allegedly contracted cancer and other ailments from exposure to radiation during atomic testing while on duty in the Navy, but was denied compensation by the VA. He alleged that he wanted to retain an attorney to represent him in his claim before the VA, but was prevented from doing so by the $10.00 fee limitation. In light of the presence of numerous other plaintiffs Cordray's death does not render this lawsuit moot.

which relief could be granted. *National Association of Radiation Survivors, et al. v. United States, et al.,* No. C–83–1861 (N.D.Cal. Oct. 21, 1983).[4]

■ For the reasons set forth below the court now grants plaintiffs' motion for preliminary injunction.[5]

## II. Standard for Obtaining Preliminary Injunctive Relief

The Ninth Circuit has held that preliminary injunctive relief is available where the moving party establishes either "a combination of probable success and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor." *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.,* 526 F.2d 86, 88 (9th Cir.1976) (emphasis omitted), *quoting Charlie's Girls, Inc. v. Revlon, Inc.,* 483 F.2d 953, 954 (2d Cir.1973). While, as demonstrated below, plaintiffs are entitled to injunctive relief under either standard, this court will tailor its analysis to the more traditional standard, looking to plaintiffs' probability of success and the possibility of irreparable injury.[6]

---

**4.** The court's earlier order relates to defendants' motion to dismiss plaintiffs' procedural due process claim on the ground that the Supreme Court has already upheld the constitutionality of the fee limitation and also to dismiss the First Amendment claim on the ground that plaintiffs' rights to petition, speech, and association and to meaningful access to the VA do not give rise to a right to representation by an attorney.

**5.** At oral argument attorneys for both plaintiffs and defendants agreed that this was a motion solely for preliminary injunctive relief and not for permanent injunctive relief.

**6.** The validity of the Ninth Circuit's alternative criteria for injunctive relief, which require a party to demonstrate only that her claim raises serious questions of law and that the balance of hardships tips strongly in her favor, is uncertain in light of recent rulings by the Supreme Court. *See City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 1666, 75 L.Ed.2d 675 (1983); *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 102 S.Ct. 1798, 1802–03, 72 L.Ed.2d 91 (1982). The Ninth Circuit's holding in *Beltran v. Myers,* 677 F.2d 1317, 1320 (9th Cir.1982), that

## III. Plaintiffs' Likelihood of Success on the Merits

### A. Does the $10.00 limit violate plaintiffs' right to procedural due process?

In considering procedural due process claims a court must look first to whether plaintiff has a protected liberty or property interest in the benefits which are sought. If plaintiff has such an interest the court must determine what process is due and whether the procedures used meet the requirements of the due process clause. *Mathews v. Eldridge,* 424 U.S. 319, 332–35, 96 S.Ct. 893, 901–03, 47 L.Ed.2d 18 (1976); *Devine v. Cleland,* 616 F.2d 1080, 1086 (9th Cir.1980). As discussed below, this court finds that plaintiffs have a high probability of success on their due process claim.

### 1. Has the $10.00 limit already been definitively upheld against due process challenges?

Defendants argue that the Supreme Court and the Ninth Circuit have already determined that the $10.00 limit does not violate plaintiffs' due process rights, *citing Gendron v. Saxbe,* 389 F.Supp. 1303 (C.D. Cal.1975), *aff'd per curiam sub nom. Gendron v. Levi,* 423 U.S. 802, 96 S.Ct. 9, 46 L.Ed.2d 23 (1975); and *Demarest v. United States,* 718 F.2d 964 (9th Cir.1983).[7] Yet,

---

"the greater the relative hardship to the moving party, the less strong need be the showing of probable success that is required [to obtain a preliminary injunction]" does not really affect plaintiffs' burden of proof in the instant case. As discussed below, plaintiffs' claims of hardship are closely linked with their claim of probable success on the merits, and thus easing plaintiffs' burden on the probable success factor because they have made a substantial showing of hardship would not ease their overall burden.

**7.** In defendants' motion to dismiss they also cited a number of other cases to support the proposition that the due process issue had already been decided against plaintiffs: *Hines v. Lowrey,* 305 U.S. 85, 59 S.Ct. 31, 83 L.Ed. 56 (1938); *Margolin v. United States,* 269 U.S. 93, 46 S.Ct. 64, 70 L.Ed. 176 (1925); *Calhoun v. Massie,* 253 U.S. 170, 40 S.Ct. 474, 64 L.Ed. 843 (1920); *Hoffmaster v. Veterans Administration,* 444 F.2d 192 (3d Cir.1971) (per curiam); *Staub v. Roudebush,* 424 F.Supp. 1346 (D.D.C.1976), *vacated and remanded sub nom. Staub v. Johnson,* 574 F.2d 637 (D.C.Cir.1978); and *Holley v. United States,* 352 F.Supp. 175 (S.D.Ohio 1972).

while both *Gendron* and *Demarest* held that the $10.00 fee limitation did not deny plaintiffs their due process rights, the cases do not determinatively hold either that plaintiffs in the instant case do not have a protectible property interest, or that the procedures provided by the VA are adequate to protect such a property interest.

> a. *Do Gendron and Demarest hold that veterans' claims to SCDD benefits are not protected property interests?*

*Gendron*, a veteran's challenge to the $10.00 fee limitation on procedural due process and equal protection grounds, was tried on a meager set of stipulated facts. The district court initially dismissed for want of a substantial federal question. Following the Ninth Circuit's reversal and remand with instructions to convene a three-judge court, 501 F.2d 1087 (9th Cir. 1974), the district court upheld the constitutionality of the $10.00 limitation on the ground that an applicant for benefits, unlike a recipient threatened with termination, has no property interest in benefits. Although the analysis was not necessary to its conclusion, the district court also seemed to conclude that even if such a right existed the procedures were adequate to protect them, in light of the considera-

tion which Congress had given to the problem. 389 F.Supp. at 1307.[8]

Plaintiff appealed this determination to the Supreme Court, presenting the following questions in the jurisdictional statement:

> 1. Is there a deprivation of property within the meaning of the Due Process Clause of the Fifth Amendment to the Constitution of the United States when the Veterans Administration denies a disabled veteran's claim for disability benefits under 38 U.S.C. §§ 310–13?

> 2. Does 38 U.S.C. § 3404, which limits to $10.00 the fee a retained attorney may receive for consulting with a veteran, or for preparing, presenting, and prosecuting the claim of a veteran seeking disability benefits under laws administered by the Veterans Administration, deprive veterans of property without due process of law, because a veteran is entitled to procedural protection of retained counsel in unreviewable proceedings before the Veterans Administration?

> 3. Does 38 U.S.C. § 3404, as described above, deprive veterans of liberty without due process of law because the $10.00 fee limitation arbitrarily and capriciously prevents a veteran from availing himself of a statutorily granted right to retain counsel?[9]

None of these cases are determinative of plaintiffs' claim. The older Supreme Court cases, *Calhoun, Margolin* and *Hines* are distinguishable. They were challenges by attorneys seeking to collect more than the statutory fee, not veterans as here, and they were based on a substantive rather than procedural due process theory. *Hoffmaster* and *Holley* simply relied on those earlier cases without recognizing this distinction. Finally, defendants apparently fail to realize that the district court opinion in *Staub*, upholding the statute, was vacated and thus has no precedential value whatsoever. In remanding the case the Circuit Court for the District of Columbia specifically instructed the district court to "examine the present system, and especially the nature of VA proceedings and the availability and adequacy of the free counsel provided by the service organizations." 519 F.2d 298, 302. As discussed *infra* in text, it is this sort of detailed factual analysis that this court has determined it must conduct. While, on remand in *Staub*, the district court again

dismissed plaintiff's claim, 424 F.Supp. 1346 (D.D.C.1976), on appeal the court of appeals vacated and remanded that decision once again, without publishing its reasons. 574 F.2d 637 (D.C.Cir.1977).

**8.** The court also rejected the equal protection challenge on the ground that veterans' benefits are different from other benefit programs lacking the $10.00 limit.

**9.** The jurisdictional petition also presented two additional questions not relevant to the instant case:

> 4. Does 38 U.S.C. § 3404, as described above, deprive veterans of equal protection of the laws as guaranteed by the Due Process Clause of the Fifth Amendment to the Constitution of the United States, because applicants for benefits before other agencies of the United States Government are not similarly prevented by fee limitations from retaining counsel to assist them?

(Ex. 101 to Plaintiffs' Opposition to Motion to Dismiss.)

The Supreme Court summarily affirmed the district court's determination. 423 U.S. 802, 96 S.Ct. 9, 46 L.Ed.2d 23 (1975).

The Supreme Court's summary affirmance, however, is not a holding to the effect that veterans do not have a protected property interest in their benefit claims. While summary dispositions may have binding effect, they have such effect with respect to a particular issue only if that issue was "(1) actually decided in the [court below]; (2) necessary to the . . . decision [of the court below]; (3) presented [to the Supreme Court] in the jurisdictional statement; and (4) necessarily decided by the Court in making its summary disposition." *Cherry v. Steiner,* 716 F.2d 687, 690 (9th Cir.1983) (citing *Mandel v. Bradley,* 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977)), *cert. denied,* — U.S. ——, 104 S.Ct. 1719, 80 L.Ed.2d 190 (1984); *Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). When the Court summarily affirms it adopts the judgment but not necessarily the reasoning of the court below. In summarily affirming the district court in *Gendron* the Supreme Court may have rejected the district court's determination that no protected right was at stake but have affirmed the district because it found the $10.00 fee limitation did not unconstitutionally burden this protected right. *See Demarest v. United States,* 718 F.2d 964, 967 (9th Cir. 1983) (summary affirmance in *Gendron* may have been based on conclusion that Gendron did not have a constitutionally protected property interest, or that while the property interest existed the fee limitation did not violate the veteran's right to procedural due process). Thus, the Supreme Court did not necessarily decide the issue of whether veterans have a protected property interest in disability benefits.

5. Did the District Court improperly refuse to receive evidence offered by appellant at the trial of his action, which evidence would have tended to prove that private veterans' organizations and their lay persons do not provide adequate representation at hearings of the

Nor does the Ninth Circuit's decision in *Demarest* hold that the veterans lack a constitutionally protected property interest in disability benefits. In that case the court affirmed the district court's granting of summary judgment against a veteran's claim that the $10.00 limit violated his right to procedural due process. Repeatedly noting that the Supreme Court's *Gendron* affirmance may have rested on either of the two grounds, the Ninth Circuit failed to adopt either ground as the basis of its decision. Rather, it simply held that "whichever of the two possible theories the Court in *Gendron* approved, the affirmance in that case compels rejection of the fee limitation challenge here." *Id.* at 967. Therefore, the question of whether applicants for or recipients of SCDD claims have a constitutionally protected property interest in those claims is still open for this court to decide.

b. *Do Gendron and Demarest hold that there is no denial of due process in the VA's application of the $10.00 limit to the veterans in the instant case?*

The *Gendron* and *Demarest* decisions, while holding that the $10.00 fee limitation is neither void on its face nor void as applied in the limited factual context presented to the courts in those cases, do not hold that the $10.00 limit is valid as applied to the facts of this case. It is well recognized that "a statute, even if not void on its face, may be challenged because invalid as applied." *Whitney v. California,* 274 U.S. 357, 378, 47 S.Ct. 641, 649, 71 L.Ed. 1095 (1927) (Brandeis, J. concurring), and that "[a] statute may be invalid as applied to one state of facts and yet valid as applied to another." *Dahnke-Walker Milling Co. v. Bondurant,* 257 U.S. 282, 289, 42 S.Ct. 106, 108, 66 L.Ed.2d 239 (1921). *See also*

Board of Veterans Appeals to review denials of applications for "service-connected" disability benefits?

(Ex. 101 to Plaintiffs' Opposition to Motion to Dismiss.)

*Brown v. Socialist Workers '74 Campaign Committee,* 459 U.S. 87, 103 S.Ct. 416, 419 n. 6, 74 L.Ed.2d 250 (1982) (approving district court's analysis that because application of law requiring financial disclosure was invalid as applied, court need not address alleged facial invalidity of the statute); *Rice v. Norman Williams Co.,* 458 U.S. 654, 662 n. 7, 102 S.Ct. 3294, 3300 n. 7, 73 L.Ed.2d 1042 (1982) (mere fact that statute "might have an anticompetitive effect when applied in concrete factual situations" does not render it void on its face).

■ It is particularly important to conduct a careful inquiry into a statute's application to all the facts of the case at hand where that statute is being challenged as violative of procedural due process. The courts have repeatedly held that the procedural requirements set by the due process clause are flexible and vary according to the particular factual circumstances. *Mathews v. Eldridge,* 424 U.S. at 334, 96 S.Ct. at 902. *See also Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972) ("due process is flexible and calls for such procedural protections as the particular situation demands"); *Hannah v. Larche,* 363 U.S. 420, 442, 80 S.Ct. 1502, 1515, 4 L.Ed.2d 1307 (1960) (" 'Due process' is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts."); Friendly, *Some Kind of Hearing,* 123 U.Pa.L.Rev. 1267 (1975) (formality of hearing required by the due process clause may vary greatly according to the circumstances). For example, in *Fusari v. Steinberg,* 419 U.S. 379, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975) the Supreme Court held that its earlier summary affirmance in *Torres v. New York State Department of Labor,* 405 U.S. 949, 92 S.Ct. 1185, 31 L.Ed.2d 228 (1972), upholding the district court's rejection of a statutory and procedural due process challenge to New York's "seated interview" procedure for terminating unemployment benefits, did not bar an identical challenge to Connecticut's procedure. The Supreme Court reasoned that *Torres* did not bar a new constitutional challenge because plaintiff alleged that

Connecticut had a greater delay in resolving administrative appeals than did New York, and because the *Torres* court had failed to consider the probable accuracy of the challenged procedures. 419 U.S. at 388 n. 15, 95 S.Ct. at 539 n. 15. Similarly, the Supreme Court held that *Torres* did not bar consideration of the statutory issue because "many of the factual distinctions that the District Court relied on to distinguish *Torres* on the constitutional issue apply equally to the 'when due' question." *Id. See Steinberg v. Fusari,* 364 F.Supp. 922 (D.Conn.1973).

In light of the analysis set forth above and having carefully examined the decisions in *Gendron* and *Demarest,* this court determines that those cases do not bar plaintiffs here from claiming that the $10.00 limit has resulted in their being denied the process to which they are due. While the Supreme Court's summary affirmance in *Gendron* clearly bars a facial challenge to the limit, it does not bar a challenge such as that made here. Plaintiffs in the instant case have engaged in extensive discovery to support their allegations that the $10.00 limit has made it extremely difficult for them to prove their claims. They have gathered a great deal of evidence regarding the way the claims process functions and whether it tends to be adversarial, the extent to which VA employees or service organization representatives are able to aid veterans in gathering supporting materials and presenting their claims, the special difficulties posed by such complex claims as those relating to Agent Orange or radiation-related illnesses, the way in which the lack of an attorney renders veterans unable to present their claims adequately, and the financial hardship imposed on veterans by the $10.00 limit. They have also presented statistical evidence regarding the success rates of various types of SCDD claims before the several levels of the VA.

By contrast, the record in *Gendron* was sparse. The case was tried on a meager set of stipulated facts, and plaintiffs presented no evidence that service organi-

zation representation was inadequate or that the veteran's claim was particularly complex. Plaintiff also made no showing that his inability to obtain representation by an attorney prejudiced his right to a fair hearing. Rather the thrust of Gendron's attack was that the $10.00 fee restriction on his ability to retain counsel was a per se violation of his due process rights.

*Demarest*, like *Gendron*, does not bar all possible challenges to the $10.00 restriction, and does not bar the challenge in the instant case. The *Demarest* court explicitly left open the possibility that a plaintiff in a factually different situation from the plaintiffs in *Demarest* or *Gendron* might mount a successful challenge to the $10.00 limit. In determining that the factual differences *Demarest* attempted to draw between his case and *Gendron* were insufficient to distinguish them,[10] the Ninth Circuit implied that a plaintiff in other factual circumstances might well be able to distinguish the two cases. *Demarest*, 718 F.2d at 967.

This court finds that *Demarest*, like *Gendron*, is distinguishable from the challenge now before the court because the complaint in *Demarest* itself posits the claim in facial terms, stating that "[p]laintiff has a constitutional right to retain counsel at an administrative hearing of this kind, and the statute, on its face, has prevented him from retaining counsel . . . ." (Ex. 126 to Plaintiffs' Opposition to Motion to Dismiss at 5.) Moreover, the manner in which Demarest's claim was presented indicates that plaintiff was presenting only a facial challenge to the statute rather than making the full factual presentation necessary to determine whether the *application* of the statute results in a denial of due process rights. *Demarest*, like *Gendron*, was tried on stipulated facts (Transcript of Nov. 25, 1974 hearing, Ex. 123 to Plaintiffs' Opposition to Motion to Dismiss, at 4–5), and counsel did not even make an oral argument before the trial court. 718 F.2d at 968. Nor did plaintiff in *Demarest* build a full record regarding the actual operation of the VA, the extent to which VA hearings are adversarial, the difficulty of presenting claims fully without the aid of counsel in ordinary and particularly in complex cases, and the harm which veterans suffer when they are denied disability claims. Demarest's attorney was not even *permitted* to make the argument that the representation provided by lay service representatives was inadequate to meet the needs of the claimants. (Transcript, Ex. 123 at 5.)

█ Furthermore, this case involves a category of plaintiffs not considered in *Gendron* and *Demarest*—recipients of benefits whose benefits are subject to termination or reduction. Gendron and Demarest were first-time applicants. In both cases the court observed that, as discussed more fully below, recipients of benefits have a constitutionally protected property interest. Under the reasoning of *Gendron*, adopted by *Demarest*, those plaintiffs who are or represent recipients clearly have a protectable property interest and are entitled to procedural due process.[11]

█ In sum, this court finds that neither *Gendron* nor *Demarest* nor any of the other cases decided to date bar plaintiff's claim in the instant case.[12] Such prior

---

10. Demarest attempted to distinguish his claim from *Gendron* on grounds which, as the Ninth Circuit pointed out, were irrelevant to his claim. He pointed to the differing length of military service and character of discharge in the two cases, the alleged lateness of Gendron's claim, and the fact that whereas the dispute in *Gendron* apparently turned on service connection, that in *Demarest* concerned the existence of disability. The Ninth Circuit noted that these distinctions were legally irrelevant since the length of military discharge and character of discharge are of no import so long as the claimant has served and been discharged honorably,

· since no statute of limitation applies to these claims, and since both disability and service connection are necessary to establish a viable claim. 718 F.2d at 967.

11. For the reasons explained *infra* this court concludes both categories of plaintiffs in this case, recipients and applicants, are entitled to the same protection.

12. *Groza v. Veterans Administration*, No. S–82–679 (E.D.Cal. March 15, 1984), does not compel a different result. That decision, of course, is not binding on this court. Moreover, the *Groza*

cases do not hold that veterans lack a protected property interest in their benefit claims. These cases also do not bar a plaintiff from claiming, based on a full factual presentation as to the actual operation and effect of the $10.00 limit, that the application of that limit to the plaintiffs in this case has caused them to be denied the process to which they are due under the due process clause. Accordingly, this court now turns to a full analysis of each of these issues.

2. *Do plaintiffs have a protected property interest in their benefit claims?*

■ Plaintiffs include recipients of and applicants for service-related death and disability benefits and veterans' organizations representing such individuals. The court concludes that recipients and applicants have a protected property interest in their claims to SCDD benefits. It is clear that recipients of welfare, social security or veterans' educational benefits have a statutorily created "property" interest protected by the due process clause of the Fifth Amendment. *See Goldberg v. Kelly,* 397 U.S. 254, 261–62, 90 S.Ct. 1011, 1016–17, 25 L.Ed.2d 287 (1970); *Mathews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976); *Devine v. Cleland,* 616 F.2d 1080, 1086 (1980). For the same reasons property interests were found in these cases a veteran's interest in the continued receipt of death and disability payments is a protected property interest. The basic entitlement to such benefits is set forth in 38 U.S.C. §§ 310 and 321, and these sections provide an absolute right to benefits to qualified individuals. *Cf. Doran v. Houle,* 721 F.2d 1182 (9th Cir.1983) (no protected property interest in permit allowing veterinarians to perform test for brucellosis in cattle, where no statute or regulations set for standards for issuing or denying such permits), *cert. denied,* —— U.S. ——, 104 S.Ct. 2152, 80 L.Ed.2d 538 (1984).

Recipients' expectation in the continued receipt of benefits is bolstered by Congress' repeated expression of concern for veterans' welfare.

Throughout our Nation's history, our people and our Federal Government have shown special concern for meeting the needs of those who are disabled as a result of wartime service in the country's Armed Forces and, more recently, as the result of service in time of either war or peace. Federal assistance to those so disabled has been based upon the national purpose that everything possible should be done to help the disabled veteran readjust to civilian life.

S.Rep. No. 96–746, 96th Cong., 2d Sess. (1980), *reprinted in* 1980 U.S.Code Cong. & Ad.News 4555, 4564. In light of this concern, recipients may reasonably expect that the death and disability benefit programs will continue to exist.

Applicants for SCDD benefits, as distinct from recipients threatened with total or partial termination, also have a property interest in the receipt of those benefits. While the Supreme Court has never expressly held that applicants for government benefits have such a property interest, the Ninth Circuit and many lower courts have so held. *See, e.g., Ressler v. Pierce,* 692 F.2d 1212, 1214–16 (9th Cir. 1982) (applicants for federal rent subsidies have a property interest in obtaining such subsidies); *Griffeth v. Detrich,* 603 F.2d 118, 120–22 (9th Cir.1979), *cert. denied sub nom. Peer v. Griffeth,* 445 U.S. 970, 100 S.Ct. 1348, 64 L.Ed.2d 247 (1980) (applicants for general relief have property interest because authorizing statute and implementing regulations create "a legitimate claim of entitlement and expectancy of benefits in persons who claim to meet the eligibility requirements," 603 F.2d at 121, and benefits are not discretionary); *Kelly v. Railroad Retirement Board,* 625 F.2d 486, 489–90 (3d Cir.1980) (applicant for disabled child's annuity under Railway Retirement Act has property interest in such

court simply applied the *Demarest* and *Gendron* decisions without engaging in a comprehensive

examination of the facts surrounding the case at hand.

annuity); *Wright v. Califano,* 587 F.2d 345, 354 (7th Cir.1978) (applicants initially denied social security benefits, like those facing terminations, are entitled to due process); *Davis v. United States,* 415 F.Supp. 1086, 1090–92, 1095–96 (D.Kan.1976) (applicant for compensation for injuries incurred while engaged in prison employment has property interest in compensation for injuries which may severely restrict or eliminate his earnings capacity); *Shaw v. Weinberger,* 395 F.Supp. 268, 270–71 (W.D.N.C. 1975) (Supplemental Security Income applicant has property interest); *Barnett v. Lindsay,* 319 F.Supp. 610, 612 (D.Utah 1970) (welfare applicant has property interest). *See also Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) (applicant for admission to practice law entitled to due process).

These courts reasoned that applicants, just like recipients threatened with termination for alleged ineligibility, have a property interest because of their statutory entitlement to benefits if they meet the substantive requirements. For example, the court in *Davis v. United States,* 415 F.Supp. 1086 (D.Kan.1976), provided a careful analysis of the property interest of an applicant for compensation benefits for injuries allegedly suffered while employed in a federal prison hospital:

> [T]he applicant's interest consists of a claim authorized by statute and regulations to secure compensation for alleged employment disabilities of prison origin that may severely restrict, and sometimes eradicate, his earning potential upon release into society. Although at the application stage of the proceedings neither plaintiff nor a claimant in his position has yet been administratively adjudged entitled to receive benefits under the regulatory scheme, an applicant nonetheless possesses a property interest of sufficient magnitude to invoke the protection of the Fifth Amendment's due process clause. Like the welfare plaintiffs in *Goldberg v. Kelly,* ..., inmates have been granted an entitlement to compensation benefits under 18 U.S.C. § 4126 and its attendant regulations if

they factually satisfy the criteria set forth by the regulations. By their establishment of an objective medical standard for qualification, the regulations create a legitimate expectancy that an individual application will not be denied unless the Bureau factually determines either that the claimant does not suffer from a disability originating from his prison employment, or from one that would affect his work capacity after release .... This property interest is one of substantial importance to the plaintiff, as its arbitrary denial could leave him with an uncompensated disability of lifelong duration and condemn him to 'suffer grievous loss.'

*Id.* at 1090–91. The analysis of these cases establishing a property interest in applicants for benefits applies equally in this case. Moreover, as discussed *supra,* applicants for SCDD benefits, like recipients, have reason to believe that Congress will continue to ensure that persons who have been disabled in the course of serving their country's military will receive adequate compensation. Plaintiffs have a high probability of success on their claim to a property interest in the SCDD benefits.

■ This interpretation is consistent with the Supreme Court's analysis of *Goldberg* in *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972):

> The welfare recipients in *Goldberg v. Kelly, supra,* had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them. The recipients had not yet shown that they were, in fact, within the statutory terms of eligibility. But we held that they had a right to a hearing at which they might attempt to do so.

As the *Davis* court observed:

> This statement demonstrates that the focal point of *Goldberg* was not upon the fact that benefits have previously been received, but upon the existence of statutory provisions creating the right to wel-

fare and defining the terms under which it could be obtained. *Davis v. United States*, 415 F.Supp. at 1092. It is true that a property interest in a benefit must be grounded in "a legitimate claim of entitlement" which is "more than an abstract need or desire for it" or "a unilateral expectation of it." *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. However, the plaintiffs here have the requisite legitimate claim of entitlement by virtue of the statutory entitlement to veterans benefits and the requisite performance of military service by them or those that survive. If they meet the requirements for service-connected death and disability payments they are entitled to benefits.

3. *Does the $10.00 fee restriction deny plaintiffs the process to which they are due?*

■ In determining what process is due the court must employ a flexible balancing test that takes into account all the particular facts and circumstances, as the need for procedural safeguards varies with the situation:

" '[d]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 [81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230] (1961). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 [92 S.Ct. 2593, 2600, 33 L.Ed.2d 484] (1972) .... [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *See, e.g., Goldberg v.*

*Kelly, supra,* 397 U.S. at 263–71 [90 S.Ct. at 1018–22].

*Mathews,* 424 U.S. at 334–45, 96 S.Ct. at 902–08 (citations to unofficial reporters omitted).

a. *The private interest that will be affected by the official action*

■ The veterans' interest in obtaining service-connected death and disability benefits is extremely high. Their need for such benefits is great and compensation through the VA claims procedure is the veterans' sole remedy against the government. They cannot sue for disabilities stemming from their military service under the Federal Torts Claims Act. *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950).

Many of the claimants and recipients are totally or primarily dependent upon service-connected death and disability benefits for their support. *E.g.,* Maxwell Dep. at 78–80; Warehime Decl. ¶ 10; Stavick Aff. at 30. Most of the claimants have some disability, even if the VA ultimately determines they are not entitled to benefits (Hawke Dep. at 155–56; Verrill Dep. at 225–26), and many claimants' disabilities prevent them from working at all. *E.g.,* Huskey Aff. at 2, ¶ 4; Warehime Decl. ¶ 10; Maxwell Dep. at 35; Autrey Decl. ¶ 7; Souness Decl. ¶ 13. As a result, a substantial number of the plaintiffs are poor or destitute. *See* Warehime Decl. ¶ 10; Autrey Decl. ¶ 7; Burke Decl. ¶ 14; Dempsey Decl. ¶ 8; McBee Decl. ¶ 14; Souness Decl. ¶ 13. [W]e have lots of people that ... can't even afford a car or they can't even have a driver's license any more. (Woodall Dep. at 267).

Certainly plaintiffs have shown their interest in obtaining benefits to be as great or greater than that of the veterans receiving educational benefits or applicants for subsidized housing who have been held entitled to substantial procedural protections by the Ninth Circuit. *See Ressler v. Pierce,* 692 F.2d 1212 (9th Cir.1982); *Devine v. Cleland,* 616 F.2d 1080 (9th Cir.

1980).[13] *Cf. Goldberg v. Kelly,* 397 U.S. 254, 261 & 264, 90 S.Ct. 1011, 1016 & 1019, 25 L.Ed.2d 287 (1970) (inappropriate to cut off benefits of welfare recipients in face of 'brutal need,' particularly since such individuals, lacking independent resources, will have to concentrate efforts on finding means for daily subsistence rather than on seeking redress from the bureaucracy).

The court must weigh not only the direct financial impact of the VA's denial of an eligible veteran's claim, but also certain less direct interests. The poverty and despair a veteran and his family may suffer from an uncompensated disability could frustrate that veteran's reintegration into civilian society. In addition, as the Ninth Circuit found in *Devine,* the court "cannot ignore an important concern: the psychological value to the veteran of personally communicating with bureaucracy before it profoundly alters his entitled status." 616 F.2d at 1088.

The fact that some of the plaintiffs are applicants for new or additional benefits and do not face termination of existing benefits may somewhat reduce the weight of their interest but certainly does not eliminate it. *See Ressler v. Pierce,* 692 F.2d at 1217. Veterans killed or injured in military service generally lose all or much of their ability to earn a livelihood. "[A]rbitrary denial [of benefits] could leave him with an uncompensated disability of lifelong duration and condemn him to 'suffer grievous loss.'" *Davis v. United States,* 415 F.Supp. at 1091.

**b.** *The risk of erroneous deprivation*

In one sense the VA itself has recognized the important role played by attorneys in helping claimants apply for SCDD benefits by according claimants the right to repre-

sentation by an attorney at all stages of an appeal. 38 C.F.R. § 19.150 (1983). However, as the VA has admitted in another context, the $10.00 fee limitation essentially eliminates veterans' right to obtain counsel of their own choosing to represent them in bringing service-connected death and disability claims before the VA.[14] The limit, enforced by the VA with informational letters, and the threat of criminal prosecution (Verrill Dep. at 103–05), causes many attorneys to decline to represent veterans. *E.g.,* Bakal Aff. ¶ 1; Johnson Decl. ¶ 6; Caron Decl. ¶ 5; and Fox Decl. ¶ 6. Moreover, the strict fee limitation cannot but drastically limit the amount of time any attorney who takes a SCDD claim can afford to spend on the case, compared to the time she might have spent were she able to obtain more than a $10.00 fee.

To determine whether the $10.00 fee limitation, by eliminating the veterans' right to obtain counsel of their own choosing, creates a substantial risk of erroneous deprivation, the court must consider both the role generally played by attorneys and the valuable services they may perform, and the particular characteristics of the process for obtaining SCDD benefits at the VA. The court must then determine whether, given the procedures employed by the VA, the fee limitation results in a denial of due process.

**i.** *General importance of attorneys*

As the Supreme Court has held, "[t]he right to be heard would be in many cases, of little avail if it did not comprehend the right to be heard by counsel." *Goldberg v. Kelly,* 397 U.S. 254, 270, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287 (1970), *quoting Powell v. Alabama,* 287 U.S. 45, 68–69, 53 S.Ct.

**13.** Curiously, the court in *Demarest* made no attempt to reconcile its decision with its earlier holding in *Devine* which recognized a property interest in veterans' continued receipt of educational benefits. Only a formalistic recipient-applicant distinction justifies this result, for surely there is a more compelling interest in death and disability benefits than in the continued receipt of educational benefits.

**14.** July 14, 1981 Letter from VA to Hon. Alan K. Simpson, Chairman of the Senate Committee on Veterans' Affairs. (Ex. 114 at 43, 54). The letter states:

It is probably true that, except for those whose low income qualifies them for free legal services, the current fee limitation effectively precludes attorney representation before the VA.

55, 63–64, 77 L.Ed. 158 (1932). "Counsel can help delineate the issues, present the factual contentions in an orderly manner, conduct cross-examination, and generally safeguard the interests of the recipient." *Goldberg*, 397 U.S. at 270, 90 S.Ct. at 1022. The Court's recognition of the important functions served by attorneys led it, in *Goldberg v. Kelly*, to require that all welfare recipients be permitted to retain counsel to assist them in a hearing before the agency prior to having their benefits terminated. *Id.*

Court's awareness of the important services lawyers may provide has led them to require that persons be able to retain attorneys or even have one appointed for them [15] in a variety of other civil contexts as well.[16] *Ressler v. Pierce*, 692 F.2d 1212, 1219–22 (9th Cir.1982) holds that applicants for Section 8 subsidized housing, initially found ineligible, may have an attorney prepare a written response or appear at the HUD office to contest this determination. In *Elliott v. Weinberger*, 564 F.2d 1219 (9th Cir.1977), *rev'd in part on other grounds sub nom. Califano v. Yamasaki*, 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979), the Ninth Circuit noted that "[t]he objective [of due process] is to ensure that the agency will acquire the information it should have in a manner fairly calculated to illuminate the issue for reasoned decision making." *Id.* at 1233, *quoting City of Santa Clara, California v. Kleppe*, 418 F.Supp. 1243, 1260 (N.D.Cal.1976). The court held that old age and disability insurance recipients threatened with recoupment by the government have a right to a pretermination hearing and representation by counsel in order to assert their waiver arguments. 564 F.2d at 1235. The Supreme Court affirmed this aspect of the court's judgment reasoning that because the waiv-

er determination rests on findings of fault and credibility, a pretermination hearing is required. 442 U.S. at 690–97, 99 S.Ct. at 2552–56. The Ninth Circuit has also held that persons have a right to retain counsel to represent them in hearings before the Securities and Exchange Commission, *Sartain v. Securities and Exchange Commission*, 601 F.2d 1366, 1375 (9th Cir.1979), and in proceedings prior to expulsion from school. *Black Coalition v. Portland School Dist. No. 1*, 484 F.2d 1040, 1045 (9th Cir.1973). In *Cleaver v. Wilcox*, 499 F.2d 940 (9th Cir.1974), a case involving parents' right to retain custody over their children, the Ninth Circuit found the right at stake so important and the role of an attorney so key that it required *appointment* of counsel. *Id.* at 945. The court reasoned that "[d]espite the informality of the juvenile dependency hearings, the parent, untutored in the law, may well have difficulty presenting his or her version of disputed facts, cross-examining witnesses, or working with documentary evidence." *Id.*

The Ninth Circuit's determination of whether counsel must be permitted rests generally on the importance of the interest at stake, the nature and complexity of the issues to be presented and the likely ability of the persons involved to be able to present such issues. Thus, in *Toney v. Reagan*, 467 F.2d 953 (9th Cir.1972), the court held that non-tenured professors denied reappointment are not entitled to counsel, noting that welfare recipients dealing with the state are far more likely to need counsel than are professors dealing with their peers, absent a showing of special circumstances requiring representation by counsel. *Id.* at 958.

Other Circuits, too, have required that persons be allowed to retain counsel in a variety of agency hearings. *E.g., Ahern v.*

---

**15.** Some have argued that the role played by civil counsel is so important that civil defendants, and even, in certain circumstances, plaintiffs, have the right to be *provided* with counsel. *E.g., The Indigent's Right to Counsel in Civil Cases,* 76 Yale L.J. 545 (1967); *The Right to Counsel in Civil Litigation,* 66 Colum.L.Rev. 1322 (1966).

**16.** While the right to appointed counsel in criminal cases rests, of course, on Sixth Amendment grounds, the Court's reasoning regarding the lay person's need for an attorney's assistance applies equally to civil cases. *See Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

*Board of Education,* 456 F.2d 399, 403 n. 2 (8th Cir.1972) (public school teacher threatened with discharge); *Caulder v. Durham Housing Authority,* 433 F.2d 998, 1004 (4th Cir.1970), *cert. denied,* 401 U.S. 1003, 91 S.Ct. 1228, 28 L.Ed.2d 539 (1971) (person threatened with termination of lease in federally assisted public housing project). In reviewing denials of social security disability claims, similar in some ways to the determinations at issue in the instant case, courts have emphasized the importance of representation by counsel by considering the lack of counsel as one reason for remanding or even reversing the Secretary's decision. Where, despite the claimant's right to retain counsel and to pay counsel up to 25% of the benefits they ultimately receive, claimants have failed to enlist the aid of an attorney, courts hold the ALJ to a particularly high standard of developing a full and fair record. If the administrative law judge ("ALJ"), always theoretically conducting hearings in a non-adversarial fashion, does not meet this standard by making a scrupulous inquiry into all the relevant facts, the determination may be reversed or remanded. *E.g., Deblois v. Secretary of HHS,* 686 F.2d 76, 80–81 (1st Cir.1982); *Echevarria v. Secretary of HHS,* 685 F.2d 751, 755 (2d Cir.1982); *Smith v. Secretary of HEW,* 587 F.2d 857 (7th Cir.1978); *Webb v. Finch,* 431 F.2d 1179 (6th Cir.1970).

It is crucial to note that by contrast to the participants in many agency hearings who will have later opportunities to engage counsel to assist them in their claims either in a post-termination hearing or in a subsequent judicial proceeding, the $10.00 fee limitation restricts veterans' ability ever to retain counsel to assist them in bringing service-connected death and disability claims against the VA. No subsequent judicial review of the VA determination is even available, 38 U.S.C. § 211(a), and the $10.00 fee limitation applies in any case to both pre- and post-termination proceedings. *Cf. Mathews v. Eldridge,* 424 U.S. 319, 339 & 349, 96 S.Ct. 893, 904 & 910, 47 L.Ed.2d 18 (1976) (denying social security disability recipients right to pre-termination hearing with counsel, but noting that recipient had right to full evidentiary post-termination review with assistance of counsel both at the agency level and, ultimately, in court).

ii. *Importance of attorneys in this case*

To determine the importance of representation by counsel to SCDD claimants the court must examine the procedural context in which such claims are brought, and the roles played by both VA personnel and service organization representatives, as well as the role which might be played by attorneys. Unfortunately, it is not possible to make this determination simply through a statistical comparison of the relative success of attorneys and other representatives, although the parties have submitted statistics comparing the relative success of those few attorneys who represent SCDD claimants before the VA notwithstanding the $10.00 fee limit with that of other representatives. Both sides argue that the evidence supports their position. While plaintiffs argue that "claimants represented by attorneys/agents appear to be more successful than claimants represented by non-attorneys at the BVA level," (Plaintiff's Opposition to Motion to Dismiss at 40–41), the government argues that the same statistics show that the percentage of allowances for persons represented by attorneys/agents was virtually identical to those represented by service organizations. (Defendant's Brief at 5).

The court finds that the statistics are not helpful to the determination of whether the $10.00 limit impedes claimants from obtaining adequate representation. The success rate of those few attorneys who are now taking SCDD cases on essentially a pro bono basis is a completely inadequate predictor of the success rate of paid attorneys. Not only may paid attorneys be able to devote more time and resources to the cases (*see* Woodall Dep. at 263), but they may also develop substantial expertise in the complicated legal areas involved with SCDD claims. Currently, the few attorneys who take SCDD cases generally do so

on a one-time basis. (Woodall Dep. at 260–62). Thus, it is not surprising that attorneys who take SCDD claims notwithstanding the $10.00 limit appear to do little better than the service organization representatives. (*See* BVA statistics, Ex. 104; Defendant's supplemental authorities). By contrast, paid attorneys who represent veterans in discharge upgrade proceedings, which are not governed by a fee limitation, had a success rate of 72.73% compared to service organization representatives' success rate of 48.28%. (Legal Services Commission Report to Congress on Access of Veterans to Legal Assistance, Ch. 2 ("LSC Report"), Ex. 70 at 123). Accordingly, the court must look beyond such statistical evidence to determine the claimants' need for representation, and how well this need is being met under the current system.

Claimants for service-connected death or disability benefits must "submit evidence sufficient to justify a belief in a fair and impartial mind that [the] claim is well grounded." 38 C.F.R. § 3.102 (1983). They must demonstrate not only that the disability exists or that the death has occurred, but also that this disability or death was "service-related." 38 U.S.C. § 301 *et seq.*

Claims are initially presented to one of the approximately 58 VA regional offices where a rating panel, made up of a medical specialist, a legal specialist, and an occupational specialist, makes an initial determination, (rating), as to whether the claim should be granted or denied. (LSC Report, Ex. 70 at 69–70). These ratings are based on a complicated schedule containing detailed anatomical and other discussion on a variety of medical problems. 38 C.F.R. § 4.1 *et seq.* (1983).

Once the rating board has made its determination it provides the claimant with a Notification of Decision (ND). 38 C.F.R. § 3.103(e) (1983). The most common ND is a very brief computer notice stating something to the effect that "[y]our claim for death benefits is disallowed. The evidence does not establish that the veteran's death

was due to a service-connected disability." (Verrill Dep. at 144).

To challenge an adverse regional office decision the claimant must file a "Notice of Disagreement" ("NOD") within one year from the mailing of the ND. If no NOD is filed the decision is deemed final. 38 C.F.R. § 19.129 (1983).

Upon receipt of the NOD the VA may either reverse its decision or take any necessary preliminary action and proceed to prepare a "Statement of the Case" ("SOC"), in which the VA frames the issue for appeal. The SOC should include a summary of the evidence, a citation to pertinent laws and regulations, the decision reached by the rating board, and the reasons for that decision. 38 C.F.R. § 19.120 (1983).

Once the claimant receives the SOC he must perfect his appeal by filing a "Substantive Appeal" within 60 days from the date of the mailing of the SOC, or within the remainder of the one-year period from the date of mailing of the ND. 38 C.F.R. § 19.129(b) (1983). The appellant is "presumed to be in agreement with any statement of fact contained in the statement of the case to which no exception is taken," 38 C.F.R. § 19.121(b)(3) (1983), and so the substantive appeal must set out specific allegations of error of fact or law. 38 C.F.R. § 19.123(a) (1983).

Upon filing of a Substantive Appeal the claim is transferred to the Board of Veteran Appeals ("BVA") in Washington, D.C. The BVA consists of sixteen three-member panels, the members of which are Presidential appointees. *See* LSC Report, Ex. 70 at 71; 38 U.S.C. § 4001; 38 C.F.R. § 19.110 (1983). The BVA is to base its decision for affirmance, reversal, or remand of the rating board's determination "on the evidence and argument of record, and will not be limited to that cited in the statement of the case." 38 C.F.R. § 19.121(b)(5) (1983). The Board's decision should be based on a review of the entire record. 38 C.F.R. § 19.180 (1983). The regulations set forth no formal requirement of deference to the determination of the rating panel.

BVA determinations are final, except that reconsideration by the BVA is available upon allegation of errors of fact or law or upon discovery of new evidence. 38 C.F.R. §§ 19.104 (1983); 19.85 (1983). Judicial review is precluded by statute. 38 U.S.C. § 211(a).

At all stages of a claimant's dealings with the VA the claimant is permitted by regulation to introduce documentary, testimonial, or other evidence in support of his claim, as well as to raise any arguments he seeks included in the record. 38 C.F.R. §§ 3.103(b), 19.172 (1983). Theoretically, "[u]pon request a claimant is entitled to a hearing at any time on any issue involved in a claim" in which he may present such evidence. 38 C.F.R. § 3.103(c) (1983). The regulations also provide that claimants have a right to a "nonadversary" hearing before the BVA so that they may present argument or testimony. 38 C.F.R. § 19.-157 (1983). The claimant may arrange for the voluntary appearance of witnesses, but the BVA will not require the appearance of any witness, including VA personnel. 38 C.F.R. § 19.165 (1983). Cross-examination is not permitted at these hearings. 38 C.F.R. § 19.157 (1983).

The undisputed factual evidence submitted by the plaintiffs in this case shows that both the procedures and the substance entailed in presenting SCDD claims to the VA are extremely complex. Procedurally claimants are faced with an interplay between the following: statutes; regulations published in the Code of Federal Regulations; the Procedural Manual M–21–1 (Ex. 17); the BVA Manual (Ex. 45); the Program Guide (Ex. 19); the Filed Appellate Procedures Manual M1–1 (Ex. 150); adjudication memoranda; VA circulars; informal memoranda; and BVA decisions. The interrelationship between these various rules is so complex that one VA adjudication officer, Thomas Verrill, developed his own personal cross-index on file cards in an attempt to master the complexity. (Verrill Dep. at 220–21). The VA's Northern California office is even attempting to develop a computerized cross-index for the various VA directives, regulations, and statutory provisions. *Id.* at 221.

Veterans' failure to comply with the VA's procedural regulations may result in denial of their claims. Where, for example, a person is advised by the VA to produce certain evidence and fails to respond to the letter within a year, the VA may make a "record purpose disallowance," denying the claim. (38 C.F.R. § 3.109 (1983); Verrill Dep. 303–04; Woodall Dep. 63–69). As this denial is made without further notice to the claimant, the claimant has no opportunity to appeal. (Verrill Dep. 307). Moreover, the record purpose disallowance results in a forfeiture of accrued or retroactive benefits if the claim is ultimately reopened. (Verrill Dep. 306). Such record purpose disallowances make up a substantial number of the claims which are ultimately denied by the VA. (Woodall Dep. 236; VA statistics, Ex. 99 at 6–14). Similarly, veterans may be severely prejudiced by their failure to comprehend and thus meet the burdens of proof and time limits incorporated in the various regulations and informal circulars. *E.g.*, Woodall Dep. 140–43 (discussing VA interpretation of reasonable doubt standard); Verrill Dep. 462–63 (consequences of failure to file a timely substantive appeal). Moreover, the VA's failure to furnish an applicant with notice of a time limit does not extend the period of time allowed for the action involved. 38 C.F.R. § 3.109(b) (1983).

Claims for service-connected death and disability benefits often turn on very complicated substantive analyses as well. The determination of the degree of disability frequently rests on a difficult medical analysis, and proof of service connection may raise causation issues which require both medically and legally complex analyses. In addition, difficult questions may arise as to whether a veteran's death or disability resulted from his "willful misconduct," 38 U.S.C. §§ 310 and 410, or as to whether "clear and unmistakable error" warrants termination of service-connection. (Woodall Dep. 169–71).

Often, to make a convincing claim, veterans or their families have to gather and present vast amounts of factual information regarding both the medical nature of the veteran's illness and also the circumstances which might have given rise to that illness. (*See* LSC Report, Ex. 70 at 7; Schroeter Aff. ¶ 5). This is particularly so with respect to those claimants seeking to obtain benefits for deaths or disabilities arising from such causes as exposure to atomic radiation or Agent Orange, or from Post Traumatic Stress Syndrome ("PTSS"). Such claims may often involve "more legal and procedural complexities than do many judicially litigated matters...." (Johnson Decl. ¶ 4). *See also* Woodall Dep. 114. Adequate preparation of such claims may often require hundreds of hours of work (Bakal Aff. ¶ 1; Stavick Aff. 2–13), and will in many cases necessitate obtaining expert testimony. *E.g.* Woodall Dep. 75, 143; Verrill Dep. 536–37.

The VA regulations contemplate two mechanisms to aid claimants in wading through the procedural and substantive complexities of the SCDD claims process: assistance from VA personnel; and representation by a recognized service organization, attorney, agent, or other authorized person. The regulations expressly state that "[i]t is the obligation of the Veterans Administration to assist a claimant in developing the facts pertinent to his claim and to render a decision which grants him every benefit that can be supported in law while protecting the interests of the Government." 38 C.F.R. § 3.103(a) (1983). Thus the regulations direct "the Veterans Administration personnel conducting the hearing to explain fully the issues and to suggest the submission of evidence which the claimant may have overlooked and which would be of advantage to his position." 38 C.F.R. § 3.103(c) (1982). *See*

*also* 38 C.F.R. § 19.157(c) (1983) (describing hearing before the BVA as nonadversary).

The regulations also establish a system whereby certain officially recognized service organizations may represent veterans in bringing their claims before the VA. The purpose of this system is "to assure that claimants for Veterans' Administration benefits have qualified representation in the preparation, presentation, and prosecution of claims for veterans' benefits." 38 C.F.R. § 14.626 (1983). Service organizations receive no fee for their services, 38 C.F.R. § 14.634(a) (1983), and the representatives they provide need not be attorneys. 38 C.F.R. §§ 14.626–14.629 (1983). A claimant who is being represented by a service representation may not also be represented by an attorney. 39 C.F.R. § 14.-631(c) (1983).

The evidence submitted by the plaintiffs shows that contrary to the claims of the defendants, neither the VA officials themselves nor the service organizations are providing the full array of services that paid attorneys might make available to claimants. Even assuming that all VA personnel were prepared to do everything that they could to build claimants' cases for them,[17] it is clear that the resources of the VA are insufficient to permit the substantial investment of time that would be necessary. Claims examiners are allocated a mere 2.84 hours in which to develop the facts underlying an initial SCDD claim (Woodall Dep. 48–52; Verrill Dep. 57–59), and their performance is measured in part by the speed with which they process claims. (Woodall Dep. 53). Regional offices, similarly, receive higher ratings if they are able to move claims along quickly. (Woodall Dep. 245–46).

The VA's inability to devote substantial resources to each claim evidences itself in the factual development which is done on the cases. The VA rarely does anything

---

**17.** The dual dictate of 38 C.F.R. § 3.103(a) (1983), which requires VA personnel to provide claimants with "every benefit that can be supported in law while protecting the interests of the Government," also raises a question as to the extent to which it is possible to serve the

interests of both the VA and claimants simultaneously. Clearly the financial interests of these two parties may often conflict, and it is not inconceivable that VA personnel might feel some pressure to protect the government purse.

beyond accumulating the medical and service records of the veteran involved. (Verrill Dep. at 41). Thus the VA does not generally seek out testimony which might confirm a veteran's claim that his disability was service-related, does not request experts' reports regarding possible sources of a death or disability, does not order further medical investigation by independent doctors, and does not carry out its own investigations to determine whether a group of veterans might have been exposed to harmful conditions in the course of their service with the military. Not once has the Northern California Regional office requested an expert medical opinion to aid it in determining whether a veteran's death or disability was caused by service-related atomic radiation. (Verrill Dep. at 36, 231). As Max Woodall, director of Compensation and Pension Service for the Department of Veterans Benefits for the VA explained, the claimant often bears the initial burden of tracking down potential witnesses:

> Well, its up to the claimant first, yes. I would say the primary responsibility is for the claimant to try to develop the information and the documentation to establish this claim. And then we are secondarily responsible in certain areas.

(Woodall Dep. at 156–57).

Even where the relevant information sought lies particularly within the control of the VA, it does not make the necessary effort to obtain that information. Thus, the VA does not document patterns of exposure or disease either by requesting information from other regional offices or by comparing the files of claimants within a single office, even though such cross-referencing might substantially aid veterans seeking to establish complex atomic radiation or Agent Orange claims. (Verrill Dep. at 23; Woodall Dep. at 166–68).

Similarly, the VA rarely exercises the statutory authority provided by 38 U.S.C. § 3311 to subpoena documents to support an applicant's claim. (Woodall Dep. 279). In fact, since 1979 the VA has issued only five subpoenas pursuant to this statute in connection with claims for service-connect-

ed benefits (VA Int. Ans. 25), and some of these may have been issued in an attempt to disprove rather than help support a claim. Adjudication Officer Thomas Verrill recalled just two instances in which such a subpoena had been used to obtain documents, and in both instances the VA sought the documents because it suspected that the claimant was misleading the VA. (Verrill Dep. at 61–62).

The VA, moreover, undercuts one of the important procedural rights entailed in its own regulations. It discourages applicants from exercising their right to request a hearing at any time until after the initial determination has been made in their case, even though this denial precludes claimants from having direct input into the most critical stage of the adjudication of their claim. (Woodall Dep. 16). The VA's own statistics covering a three year period show that hearings may be crucial to a veteran's chance of success in his claim. They indicate that where a personal hearing was held before the BVA the claim was almost twice as likely to succeed. (VA Supp.Int. Ans. 17(a) & 17(b), Ex. 126 at 4). Nevertheless, in the interests of practicality and conserving limited government resources it appears that the VA often encourages applicants to waive their right to a pre-determination hearing. (Verrill Dep. 272–87; Ex. 17 at 139). By contrast, a claimant's paid attorney might well advise that claimant not to waive such a right.

Not surprisingly, given the VA's apparent inability to protect a claimant's interests as fully as might that claimant's personal paid attorney, both claimants and attorneys familiar with the VA system view that system as adversarial, despite the contrary description of the 38 C.F.R. § 19.-157(c) (1983). *E.g.*, Johnson Decl. ¶ 7 (attorney); Miles Decl. ¶ 6 (attorney); Dorfmeier Decl. ¶ 11 (claimant); Cordray Decl. ¶ 13 (claimant).

The evidence shows that the veterans' service organizations which represent SCDD claimants in approximately 85% of

the appeals taken before the VA,[18] (BVA statistics, Ex. 75) like the VA itself, are severely overburdened and thus unable to perform all the services which might be performed by a claimant's own paid attorney. As Dean Phillips, attorney advisor to the BVA noted, "veterans organizations ... deal with an excruciatingly large number of [cases]." (Phillips Dep. 33). *See also* LSC Report, Ex. 70 at 49 (discussing "crushing" caseload facing service organizations).

Given this heavy caseload, and given the fact that "almost none" of the service representatives are attorneys (Standefer Dep. at 164–65),[19] it is not surprising that the representation they provide is often scant compared to that which might be provided by a private attorney. Service representatives rarely gather or develop either expert testimony or documentary evidence on their own to support the applicant's claim. (Standefer Dep. 170). *See also id.* at 188 (experts rarely used); Miles Decl. ¶ 5 (most service organizations lack resources to do extensive factual development); Turcotte Decl. ¶ 5 (same). Thus, "in almost all cases the record will consist of the claimant's service history and his service medical history." (Standefer Dep. 171).

The written memos produced by service representatives also suffer. Even in presenting a claimant's final appeal to the BVA, it is standard practice for service organization representatives to submit merely a one to two page handwritten brief. (Standefer Dep. 182–84). This brief rarely cites to authority, and in fact is frequently written by the claimant himself rather than by the representative. *Id.* at 182.

Nor does the representative make up for these written inadequacies through oral advocacy. The vast majority of BVA hearings are handled merely through the submission of an "informal hearing memorandum," and in these cases the claimant nev-

er meets with his representative. (Standefer Dep. 168–69). When claimants do appear before the BVA in a hearing, the first time they meet with the service representative who will be assisting them is usually just thirty minutes before the hearing. (Verrill Dep. 225; Standefer Dep. 166). At hearings before the local rating panel service organization representatives commonly rely upon the board members to ask all the questions, rather than asking the questions themselves. (Verrill Dep. 510–511).

It should be noted that the limited nature of the services provided by the service organization representatives, as compared to the services which might be provided by a paid private attorney, does not reflect any lack of dedication on the part of those organizations. The government has submitted numerous declarations of the heads of such veterans' service organizations as the National Veterans Service of the Veterans of Foreign Wars of the United States, the American Red Cross, the Disabled American Veterans, the American Veterans of World War II, Korea and Vietnam, and the Paralyzed Veterans of America. According to these declarations the organizations work very hard on behalf of their members and the other veterans they represent. Plaintiffs do not deny that such organizations provide substantial service, but argue simply that due to these organizations' limited resources, they are unable to provide the full array of services which a paid attorney might provide. Thus, the court concludes plaintiffs have demonstrated a high probability of success on their argument that the $10.00 fee limitation creates a high risk of erroneous deprivation. Given the very limited extent to which either the VA personnel or service organization representatives are able to assist veterans or their families in bringing service-related death and disability claims, the vast substantive and procedural complexities

18. The service organizations may represent claimants at the regional office level as well. It is not clear how many veterans obtain such representation as no such statistics are kept by the California regional office.

19. Indeed, the service representatives need not even have a college degree. (Fong Decl. ¶ 5).

facing such claimants, and the important need of such claimants, the $10.00 fee limitation deprives plaintiffs of the ability to make a full presentation of their claim to the VA. Absent the fee restriction claimants would be able to hire attorneys to assist them in gathering medical and other documentary evidence, finding witnesses who could confirm the claimants' version of events which transpired, obtaining expert testimony and reports, and presenting this evidence in a convincing fashion both on paper and in oral argument. Attorney representation is also more likely to ensure that veteran claimants comply with procedural rules and have their claims decided on the merits.

The complexity of the substance and procedures involved in these proceedings, as well as the importance of the interest at stake, certainly give rise to a need for representation which is as great or greater than the need of the welfare recipients in *Goldberg v. Kelly,* the broker dealer in *Sartain,* the applicant for subsidized housing in *Ressler,* or the recipients of old-age and disability insurance in *Elliott v. Weinberger.* It is highly unlikely that veterans or their families will, without the use of an attorney, prove able to build and present their cases as ably as an attorney. In sum, in none of these cases was it clearer that, "[t]he right to be heard would be in many cases of little avail if it did not comprehend the right to be heard by counsel." *Goldberg,* 397 U.S. at 270, 90 S.Ct. at 1022, *quoting Powell v. Alabama,* 287 U.S. 45, 68–69, 53 S.Ct. 55, 63–64, 77 L.Ed. 158 (1932).

**20.** In an Act passed on July 15, 1862, Congress provided that payments to attorneys assisting in the procurement of pension or bounty claims would be limited to $5.00, with additional small payments available under special circumstances. 12 Stat. 566 (1862). A subsequent series of statutes was passed amending this provision, and enacting similar provisions with respect to various groups. *E.g.,* 43 Stat. 607, 628 (1924); 49 Stat. 2031 (1936). Interestingly, the rationale of these original statutes no longer even appears to apply. Not only can $10.00 buy a lot less now than it used to, but the list of tasks covered by the $10.00 limit has also become broader.

### c. *The Government's interest*

Looking finally to the third factor the court should consider in determining whether a restriction denies persons their rights to procedural due process, it is clear that the government has asserted little or no cognizable interest in maintaining the $10.00 fee restriction. As discussed *infra* in connection with the government's showing of hardship which might bar issuance of a preliminary injunction, the government has failed to demonstrate that it would suffer any harm if the statutory fee limitation, in existence in some form since 1862,[20] were lifted. The government has neither argued nor shown that lifting the fee limit would harm the government in any way, except as the paternalistic protector of claimants' supposed best interests. To the extent the paternalistic role is valid, there are less drastic means available to ensure that attorneys' fees do not deplete veterans' death or disability benefits.

### d. *Conclusion*

Having weighed the parties' showings on each of the three factors set forth in *Mathews v. Eldridge,* this court determines that plaintiffs have demonstrated a high likelihood of prevailing on their procedural due process claim.

### B. *Plaintiffs' claim that the $10.00 fee limitation violates their First Amendment rights*

As a separate cause of action plaintiffs allege that the $10.00 fee restriction deprives them of their First Amendment rights to petition the government for re-

Originally, the fee limitations applied to the essentially clerical task of preparing claims forms, 13 Stat. 387 (1864), and later statutes expressly permitted percentage fees ranging from five to ten percent for litigated cases requiring more than just clerical work. 38 Stat. 711 (1914), 40 Stat. 102 (1917). It is thus ironic that whereas Congress' evident purpose in initially enacting the flat fee limitation was "to protect veterans from extortionate fees for mere clerical assistance," *Smith v. United States,* 83 F.2d 631, 640 (8th Cir.1936), the fee limitation is now preventing veterans from obtaining adequate assistance in very complex cases.

dress of grievances, and to speak and associate freely. The individual plaintiffs argue that the $10.00 restriction bars them from hiring lawyers to assist them in bringing service-related death and disability claims before the VA, thereby depriving them of their rights to petition and to meaningful access to the VA in that without the opportunity to retain counsel they cannot adequately assert their claims. The individual plaintiffs also argue that the fee restriction deprives them of their right to associate freely with retained counsel. The organizational plaintiffs' argument is slightly different. They contend that the $10.00 limit bars them from providing adequate legal services to their members. Although no law directly precludes NARS and Swords to Plowshares from representing SCDD claimants and even hiring lawyers to represent those claimants, the fee restriction allegedly indirectly cripples their ability to do so. Because the organizations are precluded from obtaining payment from successful claimants, their ability to continue operations and thereby provide legal assistance to more claimants is severely impeded.

 Even were plaintiffs' due process argument barred by the decisions in *Gendron* or *Demarest* it is clear that these cases, which did not consider a First Amendment argument, would not bar the First Amendment portion of plaintiffs' claim. In fact, the one appellate court which considered such a First Amendment argument in the context of the SCDD claims process refused to dismiss the First Amendment claim, finding it sufficiently meritorious that it should be remanded to the district court for further consideration of the nature of the VA system and the availability and adequacy of free counsel. *Staub v. Johnson*, 519 F.2d 298, 302 (D.C. Cir.1975).[21] Moreover, by contrast to the procedural due process claim, no property or liberty interest need be established as a prerequisite to asserting a First Amend-

ment claim. *Cf. Hilliard v. Scully*, 537 F.Supp. 1084, 1090 (S.D.N.Y.1982) (even though prisoner had no liberty interest in being confined in any particular prison, his right to petition the courts could not be violated by transfer designed to obstruct his access to the courts).

 If plaintiffs are successful in arguing that the fee restriction violates their First Amendment rights, the restriction can survive only if it serves substantial government interests, and is drawn narrowly to serve those interests. *United Mine Workers v. Illinois Bar Assn.*, 389 U.S. 217, 222–23, 88 S.Ct. 353, 356–57, 19 L.Ed.2d 426 (1967); *Brotherhood of Railroad Trainmen v. Virginia State Bar*, 377 U.S. 1, 7–8, 84 S.Ct. 1113, 1117–1118, 12 L.Ed.2d 89 (1964).

 Plaintiffs have shown that their First Amendment argument has a high probability of success. While the Supreme Court has never directly addressed the question presented here, its cases establish the principle that the First Amendment rights to petition, association and speech protect efforts by organizations and individuals to obtain effective legal representation of their constituents or themselves. In particular, it has held that the First Amendment rights of petition, speech, and association protect union members' efforts to, through their union, advise injured workers to obtain legal advice and to recommend specific lawyers, *Brotherhood of Railroad Trainmen*, 377 U.S. at 8–9, 84 S.Ct. at 1117–1118 (1964); a union's employment of a salaried attorney to represent its members in workers' compensation litigation, *United Mine Workers v. Illinois Bar*, 389 U.S. 217, 221–22, 88 S.Ct. 353, 355–56, 19 L.Ed.2d 426 (1967); and to employ counsel to represent members, to furnish names of injured members to attorneys, and to accept compensation for soliciting clients for counsel, *United Transpor-*

---

**21.** On remand the district court again dismissed both the due process and First Amendment claims, *Staub v. Roudebush*, 424 F.Supp. 1346 (D.D.C.1976), but the Circuit Court for the Dis-

trict of Columbia vacated and remanded this decision without publishing its reasons for the action. *Staub v. Johnson*, 574 F.2d 637 (D.C.Cir. 1978).

*tation Union v. State Bar of Michigan,* 401 U.S. 576, 580–85, 91 S.Ct. 1076, 1079–82, 28 L.Ed.2d 339 (1971). *See also NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (striking down application of state ban on improper solicitation to NAACP's efforts to provide legal representation for persons seeking to vindicate civil rights). The Court has explicitly declared that the principle underlying this series of cases should be applied broadly to protect First Amendment rights:

> At issue is the basic right to group legal action, a right first asserted in this Court by an association of Negroes seeking the protection of freedoms guaranteed by the Constitution. The common thread running through our decisions in *NAACP v. Button, Trainmen,* and *United Mine Workers* is that collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment. However, that right would be a hollow promise if courts could deny associations of workers or others the means of enabling their members to meet the costs of legal representation.

*United Transportation Union,* 401 U.S. at 585–86, 91 S.Ct. at 1082–83.

█ It is evident that the First Amendment protects individuals' rights to obtain the adequate legal representation necessary to ensure their rights of petition, access to the courts, and association, just as it protects organizations' rights to such representation. As the Supreme Court made clear in *Bates v. State Bar of Arizona,* 433 U.S. 350, 376, 97 S.Ct. 2691, 2705 n. 32, 53 L.Ed.2d 810 n. 32 (1977) the principle underlying the NAACP and union solicitation cases extends to individual efforts to obtain legal assistance. The Court was protecting the organization's efforts because the organizations were working on behalf of their members:

> Underlying [these cases] was the Court's concern that the aggrieved receive information regarding their legal rights and the means of effectuating them. This concern applies with at least as much

force to aggrieved individuals as it does to groups.

433 U.S. at 376 n. 32, 97 S.Ct. at 2705 n. 32. *See also California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972) (stating that the right to petition protects "the approach *of citizens or groups of them* to administrative agencies" in discussing exemption from antitrust liability for such approaches).

The Supreme Court has also protected individuals' access to legal assistance and information in the context of prisoner litigation. In *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) the court held that states must protect the right of prisoners to meaningful access to the court by providing law libraries or adequate assistance from legally trained persons. *See also Gilmore v. Lynch,* 319 F.Supp. 105, 110 (N.D.Cal.1970), *aff'd per curiam sub nom. Younger v. Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971) (invalidating prison regulation severely limiting law books in prison libraries because it denies reasonable access to courts, and noting that right to such access "encompasses all the means a defendant or petitioner might require to get a fair hearing from the judiciary").

█ The lower courts, too, have recognized that limitations on representation by attorneys trench upon individuals' rights of meaningful access to the courts and to free speech. For example, in *Martin v. Lauer,* 686 F.2d 24, 32 (D.C.Cir.1982) the Circuit Court for the District of Columbia stated that "while private parties must ordinarily pay their own legal fees, they have an undeniable right to retain counsel to ascertain their legal rights." It therefore held that restrictions on federal employees' communications to their attorneys of information exempt under the FOIA "implicates the fundamental right of those employees to meaningful access to the courts" *id.* at 32, as well as their right to speak with their attorneys and their right to effective assistance of counsel. The employees were plaintiffs in a suit against the

government. Similarly, in *Fentron Industries v. National Shopmen Pension Fund*, 674 F.2d 1300, 1305 (9th Cir.1982), the Ninth Circuit held · that decertifying the class action of a group of employees which had brought suit against the pension trust fund, solely because the suit was solicited by the employer, would impair the associational rights of employers and employees, and would also impair the right to meaningful access to the courts, (*citing United Transportation Union*). *See also Portland Police Ass'n v. City of Portland*, 658 F.2d 1272 (9th Cir.1981) (Reinhardt, J. dissenting) (dissenting from the majority's determination that the case was not ripe, Judge Reinhardt went on to note that regulation barring police officers from consulting with an attorney prior to filling out an incident report may well implicate the officers' freedom of association, and their right to obtain counsel or legal advice). It thus appears that the individual plaintiffs, as well as the organizational plaintiffs, have First Amendment rights to obtain legal representation at their own expense.

It is also clear that the right to petition ensures meaningful access to administrative agencies, as well as to the courts. As the Supreme Court stated in *California Motor Transport Co. v. Trucking Limited*, 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972), discussing an exemption from the antitrust laws which arises out of the right to petition, that right is not limited to attempts to influence the legislature or executive:

> [t]he same philosophy governs the approach of citizens or groups of them to administrative agencies (which are both creatures of the legislature, and arms of the executive) and to courts, the third branch of Government.... The right of access to the courts is indeed but one aspect of the right to petition.

*See also Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau*, 690 F.2d 1240, 1252–64 (1982) (en banc) (Noerr-Pennington doctrine, which has source in First Amendment right to petition, applies to attempts to influence administrative bodies as well as legislative bodies), *cert. denied*, 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983); *Stern v. United States Gypsum, Inc.*, 547 F.2d 1329 (7th Cir.1977), right to petition protects complaint about IRS agent's professional conduct to his superiors, *cert. denied*, 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977); *International Union UAW v. National Right to Work*, 433 F.Supp. 474 (D.D.C.1977) (right to petition extends to NLRB as well as courts), *rev'd in part on other grounds*, 590 F.2d 1139 (D.C.Cir.1978); *Center for United Labor Action v. Consolidated Edison Co.*, 376 F.Supp. 699, 701 (S.D.N.Y.1974) (right to petition extends to all departments of government, including state administrative agencies). Thus, the right to petition applies to plaintiffs' attempts to bring claims before the Veterans Administration. Moreover, the right to effective access to the VA is particularly crucial because the VA is the sole forum in which veterans' compensation claims may be brought. There is no judicial review of VA decisions on death and disability claims, 38 U.S.C. § 211(a), and veterans cannot sue the federal government under the Federal Torts Claim Act for injuries arising out of military service. *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950).

Nor does the fact that the veterans are petitioning the VA to obtain economic compensation rather than merely to make a political statement deny them First Amendment protection. *See, e.g., United Mine Workers*, 389 U.S. at 223, 88 S.Ct. at 356.[22] The court notes, moreover, that the claims

---

**22.** Nor does the fact the limitation attacked here is an expenditure of funds for legal representation take the statute outside the purview of the First Amendment. The Supreme Court has recognized that expenditure of funds for advocacy of political or economic interest is protected speech. *E.g., Buckley v. Valeo*, 424 U.S. 1, 35–39, 96 S.Ct. 612, 642–644, 46 L.Ed.2d 659 (1976)

(per curiam) (limits on campaign expenditures restrain speech); *Virginia State Board of Pharmacy v. Virginia Citizens Consumers Council, Inc.*, 425 U.S. 748, 761, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976) ("speech does not lose its First Amendment protection because money is spent to protect it").

of both the individual and organizational plaintiffs do implicate political values as well, because of their connection with public controversies over the safety of nuclear weapons and chemical defoliants, and the psychological stress allegedly engendered by participation in the Vietnam War. It is also established that the fact that the fee limitation is an indirect rather than a direct limitation on the plaintiffs' rights to petition and associate does not take the statute outside the purview of the First Amendment. As the Court stated in *Brotherhood of Railroad Trainmen,* the government can no more indirectly handicap access to the courts by limiting the availability of adequate representation than it can directly limit such access. 377 U.S. at 7, 84 S.Ct. at 1117.

 Finally, it is appropriate to give a potential intrusion on First Amendment rights particular scrutiny where, as in the instant case, the government may be attempting to chill the exercise of First Amendment rights because the exercise of those rights would adversely affect certain of the government's own interests. *See Porter v. Califano,* 592 F.2d 770, 780 (5th Cir.1979) ("Especially where the government is one of the parties in the related litigation, courts must most carefully scrutinize government action which attempts to chill private speech designed to raise funds for the legal fees of the private party litigating ....").

In sum, both the individual and organizational plaintiffs have established a high probability of succeeding on their claim that the $10.00 fee restriction implicates their First Amendment rights to petition, and to associate and speak freely. As discussed above with respect to plaintiffs' due process claim, plaintiffs have submitted vast numbers of depositions, declarations, and documents demonstrating that claimants' inability to employ counsel for a fee of more than $10.00 severely impedes their efforts to investigate and present their death and disability claims to the VA. This impediment implicates the First Amendment because it prevents both the individu-

al and organizational plaintiffs from adequately presenting their claims to the VA, an administrative agency.

 To determine whether this encroachment will likely be found impermissible, the court must consider whether the government's interest in maintaining the fee restriction is sufficiently substantial so as to justify the interference with plaintiffs' First Amendment rights. However, as discussed *infra* in more detail, the government has presented no such substantial justification. It has sought to defend the fee restriction only with the paternalistic argument that the limitation ensures that recipients' benefits will not be wasted upon unnecessary attorneys' fees. Yet, in the context of the First Amendment such paternalistic arguments are particularly suspect. *See, e.g., Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 770, 96 S.Ct. 1817, 1829, 48 L.Ed.2d 346 (1976) (First Amendment assumes "that people will perceive their own best interests if only they are well enough informed"). Moreover, it appears that the government might find ways to protect claimants' financial interests while at the same time respecting their First Amendment rights.

In light of the substantial threat to First Amendment interests and the limited government interests the parties have established are at stake, this court concludes plaintiffs have shown a high probability of success on their First Amendment claim.

Having determined that plaintiffs have made a substantial showing on the merits on their due process and First Amendment claims, the court looks to the other considerations for injunctive relief.

IV. *Irreparable Injury and Balance of Hardships*

A. *Irreparable Injury*

 In this case the arguments supporting plaintiffs' claims of irreparable injury are bound up in the merits of plaintiffs' claims. The very fact that plaintiffs' claims will continue to be adjudicated, fre-

quently adversely, without benefit of counsel and with no opportunity for judicial review demonstrate the inadequacy of compensatory relief or corrective relief. Irreparable injury inevitably occurs where there are property or other rights which are violated and for which there is no remedy other than injunctive relief. There is no other relief available to plaintiffs.

Often the irreparable injury showing corresponds to and overlaps with the balance of hardships. In such cases there are "competing claims of injury" and the court must balance the "conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982), *quoting Yakus v. United States*, 321 U.S. 414, 440, 64 S.Ct. 660, 675, 88 L.Ed. 834 (1944).

B. *Balance of Hardships*

1. *Potential hardship to the government if the preliminary injunction is granted*

The government has failed to demonstrate that it would suffer any harm if the $10.00 attorneys' fee limitation were lifted. It does not and cannot assert a direct financial interest in retaining the $10.00 fee limit. The veterans seek only the right to retain counsel at their own expense, not the right to have counsel provided for them by the government. Nor does the government argue or submit evidence supporting the proposition that abolishing the $10.00 limit would, by permitting the introduction of more lawyers into the system, increase the VA's administrative costs.[23]

The VA's claim of hardship is based primarily on paternalistic arguments. Defendants contend that the fee limitation must be retained to ensure that veterans' benefits are not depleted by attorneys' fees. Whether the lawyers are paid on a contingency fee basis or whether they demand retainers, suggests the government, such payments will likely come out of the veterans' death or disability benefits. Moreover, suggested the government in oral argument, lifting the $10.00 limit will not assure that all claimants secure an attorney to represent them. Attorneys will pick and choose their cases. And, where attorneys demand retainers, some claimants may simply "sit on their rights" and fail to file a claim.

The government's benevolence seems particularly misplaced where, as here, plaintiffs' claims have been denied. Plaintiffs obviously believe that their own best interests would be served by having the option to secure legal representation in certain cases, thereby increasing their chance of success at the cost of sharing any proceeds with the attorney. Veterans, of course, are adults generally presumed capable of making their own decisions. Moreover, the fact that First Amendment rights are implicated in a veterans' organization or veteran's decision to retain an attorney further undermines the government's paternalistic interest. *Cf. In re Gault*, 387 U.S. 1, 35–37, 87 S.Ct. 1428, 1447, 1449, 18 L.Ed.2d 527 (1967) (juvenile charged with delinquency has right to counsel and other procedural protections despite government's argument that juvenile proceedings are non-adversarial and safeguard the juvenile's best interest.) Finally, the government could clearly introduce less drastic measures, such as a reasonable percentage limit on contingent fee recoveries, to ensure that a veteran's dis-

---

**23.** Defendants attached to their brief in opposition to the motion for preliminary injunction a copy of the "Errata Sheet" which had been part of their earlier motion to dismiss. While in this "Errata Sheet" defendants assert that "[a]nother way in which benefits could be affected is that administrative expenses could be expected to increase causing a general budgetary affect (sic) on the entire Veterans Administration," *id.* at 5,

defendants have apparently chosen not to make this argument in their opposition to the motion for a preliminary injunction. The section of the government's brief which discusses the hardship which would be wrought by lifting the $10.00 limit makes no reference to this argument. Moreover, the government has submitted absolutely no evidentiary support for this claim. Thus the claim is not considered by the court.

ability benefits are not completely dissipated by attorneys' fees payments.[24]

■ The government also argues that granting the preliminary injunction would cause hardship in that "the introduction of a significantly larger number of attorneys would undoubtedly lead to a concomitant use of more formal and/or formalistic procedures." (Defendants' Closing Brief at 7). However, as the government has neither provided any support for this assertion nor demonstrated why such an increase in formality or even formalism would be detrimental, this purported hardship merits no serious consideration by the court.

### 2. Potential hardship to the plaintiffs if the motion for preliminary injunction is denied

Plaintiffs, by contrast, have demonstrated that they will suffer substantial hardship if the motion for preliminary injunction is denied. As has already been discussed in connection with the due process argument, plaintiffs have shown that many veterans are poor and must depend totally or primarily on SCDD benefits for their support, that the $10.00 limit effectively deprives them of the ability to obtain counsel to represent them before the VA, and that the lack of such legal representation renders veterans unable to effectively present their claims, thereby causing them to suffer great financial hardship and denying them the benefits to which they are entitled.

Plaintiffs have also shown at least a high probability of succeeding in their argument that the $10.00 fee limit deprives them of their First Amendment rights and the Supreme Court has declared that "[t]he loss of First Amendment freedoms, for even minimal periods of time unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) (employees whose First Amendment rights were implicated because they were threatened with dismissal unless they endorsed certain po-

litical party entitled to injunctive relief). *See also New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (denying government injunction barring publication of Pentagon Papers). Plaintiffs have thus shown the irreparable injury necessary to obtain injunctive relief. Because the balance of hardship also weighs heavily in plaintiffs' favor preliminary injunctive relief is appropriate.

Accordingly,

IT IS ORDERED that the motion for preliminary injunctive relief is GRANTED and that pending a trial on the merits of the above-entitled action, or until further order of this court, defendants, their agents, servants, employees, officers, attorneys, successors, assigns, or any other individual or entity within their control or supervision, and all persons or entities acting in concert with defendants or on their behalf, are hereby enjoined and shall refrain from doing any one or more of the following:

(1) enforcing or attempting to enforce in any way the provisions of 38 U.S.C. §§ 3404–3405;

(2) continuing to use, apply or circulate any regulations, forms, correspondence, notices or other documents that refer to, explain, interpret, or state the fee limitation or penalties contained in 38 U.S.C. §§ 3404–3405; or

(3) failing or refusing to post a summary of this preliminary injunction order in at least one prominent location in every VA office nationwide where SCDD claims are adjudicated or SCDD appeals decided. The parties shall submit such a summary to this court for its approval within twenty (20) days of the date of this order.

---

**24.** Congress has, for example, limited attorneys' contingent fee recoveries to 25% in the context of social security benefit claims. 42 U.S.C. § 406.